CINERAMA, INC., a New York
corporation, Plaintiff,

v.

TECHNICOLOR, INC., a Delaware corpo-
ration, Morton Kamerman, Arthur N.
Ryan, Fred R. Sullivan, Guy M. Bjork-
man, George Lewis, Richard M. Blanco,
Jonathan T. Isham, Macandrews &
Forbes Group, Incorporated, a Delaware
corporation, Macanfor Corporation, a
Delaware corporation, and Ronald O.
Perelman, Defendants.

Civ. A. No. 8358.

Court of Chancery of Delaware,
New Castle County.

Date Submitted: June 28, 1994.
Date Decided: Oct. 6, 1994.
Date Revised: Oct. 12, 1994.

Robert K. Payson, and Arthur L. Dent, Potter Anderson & Corroon, Wilmington (Gary J. Greenberg, New York City, of counsel), for plaintiff.

Rodman Ward, Jr., Thomas J. Allingham, II, John G. Day, and R. Michael Lindsey, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, for defendants.

## OPINION

ALLEN, Chancellor.

This action against the corporate directors of Technicolor, Inc. ("Technicolor") and others arises from the negotiation and effectuation of a two step transaction through which a subsidiary of MacAndrews and Forbes Group, Inc. ("MAF"), a Delaware corporation, acquired all of the stock of Technicolor for $23 per share cash. As found in the earlier, lengthy trial of this case, the cash price paid in that transaction represented more than a one hundred percent premium over the prior, unaffected market price of Technicolor stock on the New York Stock Exchange. No member of the Technicolor

board was a stockholder, officer or director of any affiliate of MAF, nor was any officer, director or stockholder of MAF a stockholder of Technicolor prior to initiation of the plan of acquisition. Following trial this court concluded that the transaction was negotiated at arm's-length and in a good faith effort to achieve the best financial result for the company's stockholders.

Plaintiff, Cinerama, Inc., was the holder of 4.4% of Technicolor's issued and outstanding stock at the times relevant to this litigation.[1] Cinerama did not tender its Technicolor stock in MAF's first stage tender offer but was cashed out in the second step merger.

The core assertions of the suit are that the board of directors of Technicolor breached duties of care and loyalty owed to the stockholders of the company in the process of negotiating the first step tender offer and the follow-up merger and that the remaining defendants—MAF and Ronald O. Perelman its controlling stockholder—participated in the alleged violation of duty, and breached duties of fairness and candor in the second stage merger of Technicolor.

This case is one of two cases arising from the acquisition brought by the same plaintiff. The other, an action against Technicolor itself, seeks a judicial appraisal of the fair value of Technicolor stock under Section 262 of the Delaware General Corporation Law. These two cases were consolidated for trial. That trial consumed 47 days and concluded, after extensive briefing, with an opinion of October 19, 1990 in the appraisal case, *Cede & Co. and Cinerama, Inc. v. Technicolor, Inc.*, C.A. No. 7129, 1990 WL 161084, 1990 Del.Ch. LEXIS 171 and an opinion of June 21, 1991, 1991 WL 111134 (revised June 24, 1991) in this personal liability action. *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, Allen, C., 1991 WL 111134 (June 21, 1991), slip op. In the personal liability action this court held that the tender offer/merger transaction had been negotiated at arm's-length with Mr. Perelman, and that

the Technicolor board of directors as a single deliberative body was not subject to any material conflict of interest, nor was the board dominated by any individual who was subject to such an interest. In the absence of facts constituting a material conflict of interest, it was, thus, held that the business judgment form of judicial review was applicable in passing upon Cinerama's claim that Technicolor directors breached a duty to the company's shareholders in authorizing the MAF two step acquisition transaction.

In its June 21, 1991 Opinion this court assumed without deciding that the Technicolor board of directors had indeed not become adequately informed concerning the value of the company in a "sale" context before it authorized the MAF transaction. I assumed director negligence because, given the development of the law in the years following this acquisition, it was a plausible assumption on the evidence and I had concluded in all events that even if the directors had been negligent in this arm's-length negotiation that the whole record supplied insufficient information to support a conclusion that the stockholders had been financially injured by that fact. This conclusion permitted one, I thought, to avoid addressing the advice of counsel defense that the directors tendered and, more obviously, to forego a detailed analysis of the "negligence" question itself.

In holding that lack of persuasive evidence of "injury" mooted the negligence question, my opinion was based upon what I had understood to be a recognized principle of corporation law: that in order to recover a judgment against a corporate director for a loss caused by negligence unaccompanied by conflicting interest, a shareholder bears the burden to show that such negligent breach of duty by a corporate director was the proximate cause of injury suffered by the corporation or the shareholders as the case may be. That principle is reflected, for example, in Section 4.01(d) and Section 7.18 of the American Law Institute's Principles of Corporate Governance (1994)[2] and Learned Hand's

---

1. Cinerama's stock was registered to the nominee Cede & Co., which is named a nominal plaintiff.

2. Section 4.01(d) states that:

A person challenging the conduct of a director or officer under this Section has the burden of proving a breach of the duty of care, including ... in a damage action, the burden of proving

opinion in, *Barnes v. Andrews*, 298 F. 614 (S.D.N.Y.1924).

Given the large premium over market price of the Technicolor common stock achieved in this merger, the record of premiums in comparable transactions during the period and the absence of what I regarded as credible evidence that the Company was worth more than $23 a share to any other buyer (including management), I concluded that the record contained insufficient evidence to support a conclusion that any financial injury to plaintiff had resulted from the assumed negligence of the Technicolor directors in negotiating the sale of this company in 1982. Judgment was, thus, entered in favor of the director defendants.

On appeal the Supreme Court, in a lengthy and complex decision, reversed several aspects of this court's opinion. *See Cede & Co. v. Technicolor, Inc.*, Del Supr. 634 A.2d 345 (1993). First, based on this court's *pro arguendo* assumption of director negligence, the Supreme Court made a judicial finding that the director defendants had breached their duty to be reasonably informed. Second, having so concluded, the Supreme Court then clarified the operation of the business judgment rule in Delaware. Specifically the Court demonstrated the effect/operation of its prior characterization of the "business judgment rule" as a "presumption". It held the principle of *Barnes v. Andrews* to be inapplicable to a claim of breach of fiduciary duty, and held that under the Delaware version of the "business judgment rule" if a shareholder establishes director negligence, thus, overcoming the presumption, he or she has established a *prima*

*facie* case of liability. Upon such a limited showing, even in an arm's-length transaction, the Court confirmed that the burden shifts to the director defendants to show that the transaction was "entirely fair" to the shareholders or the corporation; if the directors fail to meet that burden, then, arguably, the panoply of equitable remedies available under the entire or intrinsic fairness standard—including where appropriate, rescissory damages—may be impressed upon the defendants. *See* 634 A.2d at 371.

That this Delaware version of the meaning and operation of the "business judgment rule" makes that rule a liability enhancing rule (*i.e.*, it disadvantages director defendants when compared to other classes of persons charged with negligently causing injury to another) was not the subject of comment in the Court's opinion.

The case has now been returned to this court and I am required to answer a series of questions: *First*, this court has been directed to reconsider several questions relating to the conclusion that the board of directors of Technicolor was not in a conflict of interest posture with respect to this transaction. The answers to these questions may be relevant not only to the analysis of loyalty issues but also to the scope of any equitable remedy that may be found to be appropriate. *Second*, I must now determine if the directors of Technicolor have met a duty of entire fairness in authorizing the MAF acquisition. *Third*, if it is determined that the directors did not meet that burden, the court then must determine what remedy in equity is available to this shareholder.[3]

that the breach was the legal cause of damage suffered by the corporation.
Section 4.01(d) then refers the reader to § 7.18 for a more detailed statement of the legal cause standards. That Section in turn states among a number of related provisions that:
  (c) A plaintiff bears the burden of proving causation and the amount of damages suffered by, or other recovery due to, the corporation or the shareholders as the result of the defendant's violation of a standard of care set forth in Part IV [Duty of Care and the Business Judgment Rule]. . . .
*See also* Balotti and Hanks, *Rejudging the Business Judgment Rule*, 48 Bus.Law. 1337, 1345 (August 1993) ("Therefore, the [shareholder]

plaintiff has to prove that which he or she would have to prove in any civil action alleging gross negligence, including causation and damages. The existence of a "presumption" adds little or nothing to the burden a plaintiff would have as the party alleging gross negligence.") Due to my belief at that time that it was established law that causation and damages were essential elements of a negligence claim against directors the June 21 Opinion did not dilate on this point.

3. The Supreme Court directed this court to clarify some aspects of its June 21 ruling on disclosure, which was done by a January 7, 1994 Report to the Supreme Court. Thereafter (January 19, 1994) the Supreme Court affirmed that element of the appeal but on reargument of its

Neither party has asked for the opportunity to present additional evidence. The record in this court therefore continues to be the large trial record earlier created.

## I.

In summary, the positions of the parties on this remand are simple. For plaintiff the Supreme Court opinion has left very little that needs to be decided by this court. It asserts that the Supreme Court has already found that the Technicolor board was insufficiently informed; that, to put a sharp point on it, they were negligent (or as our cases express it, grossly negligent) in not "inform[ing] themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger ..." 634 A.2d at 368. Given that appellate determination, Cinerama asserts that this court cannot find that the sale process was entirely fair to the Technicolor shareholders.

Thus plaintiff contends the chief issue on remand is the remedy to which it is entitled. On this issue too it offers an elegant argument. It claims to be entitled to rescissory damages; that is the financial equivalent of restoring it to its position as a Technicolor stockholder. Cinerama simplifies the determination of what that standard would yield by referring to the record evidence concerning the sale by MAF in 1988 of all of its Technicolor stock to Carlton Communications, PLC. In this sale MAF realized a very substantial profit on its investment in Technicolor. The 1982–83 price received by Technicolor shareholders was approximately $125 million. The 1988 sale to Carlton was for approximately $750 million. Cinerama contends that rescissory damages in this case would entitle it to 4.4% of this amount, or approximately $162 per share.

For defendants the case is more complicated. They insist that while the Supreme Court appears to have found director negligence, it did so only in the context of deciding that the burden shifted to the directors to establish the entire fairness of the transac-

tion. It did not decide, so the defendants assert, that the process was fatally flawed by that fact. If it had, they say, there would have been no reason to remand the case to this court for a determination of entire fairness. Thus defendants assert that this court is now free to and indeed required to determine whether the process and price were such, in all the circumstances, to assure that the deal was completely fair to the public shareholders. Defendants contend that such review leads to the determination that they were fair in all respects.

Assuming that the court were to disagree on that, defendants say that, nevertheless, rescissory damages could never in good conscience be awarded against the defendant directors on the facts of this case because (1) they received no property in the merger from which an obligation to make restitution could arise, (2) they have been found guilty of lack of care, not of any intentional wrong, self dealing, or ultra vires act and (3) in all events, the growth in the value of the Technicolor shares over the intervening years between the merger and the Carlton sale was due in major part to the management decisions made by Ronald Perelman and the persons associated with him in the management of MAF. Thus defendants contend that restitution or rescission are simply grossly inappropriate concepts for a case of this sort.

\* \* \*

Part II of this opinion addresses the central issue on remand: whether the defendants have shown by a preponderance of the admissible credible evidence that the MAF acquisition transaction was fair or entirely fair to the Technicolor shareholders. For the reasons set forth I conclude that despite the fact that the board was inadequately informed when it accepted this 1982 proposal, in considering the entirety of the evidence, including that relating to the course of negotiations, the various agreements, the process of board consideration and approval, the price achieved, and the evidence of Techni-

January 19 ruling the Court again directed this court to consider some aspect of this disclosure issue once more (*see Cede v. Technicolor,* Del.

Supr., 636 A.2d 956 (1994) which is done *infra* at n. 23.

color's value in a sale context, the MAF transaction was fair to the Technicolor shareholders.

Some of the analysis of fairness takes into consideration that this transaction was not one that involved a board dominated by a majority with a financial interest in the transaction in conflict with the corporation's shareholders nor dominated or manipulated by a person with such an interest. In fact, I concluded after trial that the Technicolor board had only one member with a material financial interest in the transaction adverse to shareholders[4] and that the predominant majority of the board was, in approving the MAF proposal, motivated in good faith to achieve a transaction that was the best available transaction for the benefit of the Technicolor shareholders. With respect to this "loyalty" issue the Supreme Court has directed this court to address certain questions that it has found may be relevant. This I do in Part IV below.

In Part V, after reconsidering certain aspects of whether the transaction under review was approved by a board that was disinterested and independent in light of the Supreme Court's comments (at 634 A.2d at 362–66) I find that neither the board nor its deliberations were dominated or manipulated by a person with a material conflicting interest or otherwise lacked independence.

In Parts III and IV of this opinion I address, in the alternative, the question whether rescissory damages would be appropriate in this case were one to conclude that the process followed in this sale was such as to support the conclusion that the transaction was unfair to the shareholders. In light of my determination that the MAF merger was entirely fair to the Technicolor shareholders, I recognize that resolution of this additional question is not necessary to the resolution of this action. I address this question, however, (1) in order to provide plaintiff with assurance that even if one were to conclude that the directors have failed to demonstrate the entire fairness of the transaction, plaintiff would still not have recovered money damages given the evidence in this case, and (2) because the Supreme Court suggests that the availability of rescissory damages be addressed on remand. In Part III I state my opinion that rescissory damages will generally be unavailable to remedy a breach of care unaccompanied by a material conflict of interest. With respect to the alternative, "out-of-pocket" or "date of breach" measure of damages, my evaluation of the record continues to lead me to the conclusion that the most persuasive reading of the evidence is that the deal achieved represented a full price and that its consummation represented no financial injury to the Technicolor shareholders. Therefore in Part IV I conclude that neither rescissory damages nor "out-of-pocket" damages would be appropriate in this case.

## II. Fairness of the Process and of the Transaction

I turn first to the principal question on remand, whether the transaction by which the stock interest of Cinerama was converted to the right to receive $23 per share cash was entirely fair to the Technicolor stockholders. I do so on the premise—further explored in Part V below—that the MAF acquisition transaction was negotiated and approved by a board that was acting in the good faith pursuit of shareholder interests, and that such transaction was an arm's-length transaction in which the board as a whole had no material conflicting interest.

In connection with a determination of the entire fairness of this arm's-length transaction, I recall that we have been instructed

---

4. With respect to another director, Mr. Ryan the June 1991 Opinion, assumed that his state of mind may have interfered with his independence, albeit he had no financial interest in the transaction of the kind contemplated by Section 144 of the Delaware General Corporation Law, and no promise or inducement had been made to him. This assumption was made because given my conclusion that the remaining seven members of the board did not have a conflicting interest, it didn't matter to my analysis whether Ryan had such a state of mind as plaintiff posited. Moreover as I concluded on the earlier remand, a reasonable person evaluating the MAF proposal would not have found Ryan's state of mind relevant to the question presented, especially so as it was disclosed that he did not participate in the board's acceptance of the MAF proposal. *See Cede v. Technicolor*, Del.Supr., 636 A.2d 956 (1994).

that fairness may have two components: price and process. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983). The judgment whether a transaction satisfies the fairness test is, however, not a bifurcated one but is a single judgment that considers each of these aspects. *Kahn v. Lynch,* Del.Supr., 638 A.2d 1110 (1994). In some contexts price may be a relatively minor or an inapplicable consideration *see, e.g., Nixon v. Blackwell,* Del.Supr. 626 A.2d 1366, 1376 (1993) (finding that only the fairness of the process was important where the adoption of an ESOP was challenged by non-employee shareholders as providing increased liquidity solely for the ESOP holders). In other contexts price may predominate as a salient consideration. Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger. In such a setting given the rejection by our Supreme Court of the short-lived business purpose requirement for cash-out mergers,[5] price is the only substantial issue other than disclosure.[6] But in a cash-out merger that is the second step of an arm's-length transaction, the presumed reliance by the shareholders on the integrity of the process by which the price recommended by the board was arrived at, makes the fairness and adequacy of the process a more significant factor in assessing overall fairness than in the parent-sub merger context.

Thus in assessing overall fairness (or entire fairness) in this instance the court must consider the process itself that the board followed, the quality of the result it achieved and the quality of the disclosures made to the shareholders to allow them to exercise such choice as the circumstances could provide. Even though the test of fairness is a demanding one, it does not demand perfection. *Nixon,* 626 A.2d at 1377, 1381. This judgment concerning "fairness" will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case. "Fairness" simply is not

a term with an objective referent or clear single meaning. This does not mean its meaning is endlessly elastic and that it therefore constitutes no standard, but that it is a standard which in one set of circumstances or another reasonable minds might apply differently. I state this obvious fact because candor requires me to state that quite basically I cannot conclude that the transaction attacked was unfair to Cinerama, or other Technicolor shareholders, at all.

■ I, of course, desire to accord complete respect to the Supreme Court's conclusion that the director defendants were negligent and insufficiently informed when they resolved to accept the MAF proposal. And I recognize the force of the claim that a process that is uninformed can never be fair to shareholders. Yet recognizing that a single judgment concerning all factors is called for I find myself unable to conclude that the MAF tender offer/merger was not a completely fair transaction. In large measure this judgment reflects my conclusion that (1) CEO Kamerman consistently sought the highest price that Perelman would pay; (2) Kamerman was better informed about the strengths and weaknesses of Technicolor as a business than anyone else; he was an active and experienced CEO who had designed and implemented a cost reduction program that was very beneficial and knew the businesses in which Technicolor operated; (3) Kamerman and later the board were advised by firms who were among the best in the country; (4) the negotiations lead to a price that was very high when compared to the prior market price of the stock (about a 100% premium over unaffected market price) or when compared to premiums paid in more or less comparable transactions during the period; (5) while the company was not shopped there is no indication in the record that more money was possible from Mr. Perelman or likely from anyone else; management declined to do an MBO transaction at a higher price and while I did conclude that the deal was "probably locked up", if the value of the company

---

5. *See Weinberger,* 457 A.2d at 715 (overturning *Tanzer v. Int'l General Industries, Inc.,* Del.Supr., 379 A.2d 1121 (1977)).

6. Under state law disclosure is a significant issue even in a cash-out merger by a dominate share-

holder at least in those cases where shareholders are afforded the right to dissent from the merger and seek appraisal.

at that time was or appeared to be *remotely* close to the value Cinerama claimed at trial, any "lock-up" arrangement present would not have created an insuperable financial or legal obstacle to an alternative buyer. Indeed the conclusion that the transaction was probably locked up was logically and actually premised upon the belief that the $23 price was high.

Looking at the fairness of the process from the point of view of the directors rather than shareholders also reinforces my conclusion that the transaction considered as a whole was entirely fair to the shareholders. (This perspective asks what is it fair for a stockholder to expect of a corporate director.) The directors relied heavily upon the CEO and perhaps one of the clearest messages repeatedly affirmed by the Delaware Supreme Court's corporate law jurisprudence from 1985 forward is that outside directors may not blindly rely upon a strong CEO without risk.[7] But while in retrospect the defendants reliance upon Mr. Kamerman may be seen as too great, they also relied upon reports by Goldman Sachs and by Debevoise & Plimpton. Indeed, as set forth below in my opinion they relied upon the advice of their special counsel and that reliance is itself a relevant factor in assessing overall fairness. The directors were acting, and their advisors were guiding them, according to the duties known to them in 1982. In judging the fairness of this process to shareholders as well as to directors I do consider this a relevant but not dominant consideration.

Nor can I, in making an overall judgment of fairness to shareholders, put out of my mind the firm conclusion that I have reached that a large majority of the board of directors had no material interest in this transaction that conflicted with the shareholders interest.[8] Mr. Sullivan the only director with a found, material conflict fully disclosed that interest to the disinterested members of the board and the contract was thereafter approved by them.

Cinerama takes the view that once a court finds itself applying the entire fairness form of judicial review, it is irrelevant whether the directors were disinterested and acted in good faith pursuit of corporate or shareholder interests. I cannot agree. While in this case the effect of the "business judgment rule" has been held to have been exhausted and its presumption no longer of any consequence, the law of fiduciary duties of corporate directors is older and more basic than the modernly popular "business judgment rule."[9] The overall judgment of fairness to shareholders that the court must make can, and in my opinion should, take into account the good faith of the directors when it considers the "process" element of the evaluation.

Beyond good faith the directors were placed in a position at the October 29 board meeting in which highly competent, indeed, expert legal counsel advised them that they could exercise a good faith business judgment. The testimony of that attorney is clear and I accepted his honesty as a witness completely:

---

7. *See, e.g., Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986); *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1989); *Paramount Communications, Inc. v. QVC Network,* Del.Supr., 637 A.2d 34 (1994).

8. Plaintiff did not present a persuasive case for the claim that Mr. Ryan had a secret arrangement through Mr. Davis of (then) Gulf and Western that assured him of a better position if MAF acquired Technicolor and, after trial, I so found. In my post trial opinion, however, I was willing to "assume" that Ryan may have had a conflicting interest with respect to his personal hopes and expectations, because as I analyzed the case it was an irrelevancy.

9. The place of this concept in the analysis of corporate law is growing at an impressive rate. If one searches for "business judgment rule" in all American databases for each year over the last fifty years one finds a remarkable pattern. Without reproducing the results, the point is made by saying that for the each decade starting with 1943 the results are as follows: 16 reported opinions (1943–52); 25 reported opinions (1953–62); 28 opinions (1963–72); 156 opinions (1973–82); 620 opinions (1983–92). The growth continues. In the 18 months since the close of 1992 149 opinions were published that invoked this term.

[U]ltimately the question of what's in the best interests of the shareholders is a business judgment question for them as directors. I said that based on what I had heard—didn't mean I knew everything in the world, didn't mean I was a director or business person. But based on what I had heard, I thought that they could reasonably conclude, if they wanted to do it, to sign up with MacAndrews and Forbes at $23 a share, for this company that stock had been trading at nine a month or two ago, without first saying, "[w]e are up for sale," and running an auction. They weren't compelled to. It was business judgment for the directors to make as directors. (footnote omitted)

I find the Technicolor board's reliance upon experienced counsel to evidence good faith and the overall fairness of the process. Indeed, it is arguable that the board's good faith reliance on this legal testimony may provide an independent basis for finding the directors not liable for approving the sale to MAF. 8 *Del.C.* § 141(e), as amended in 1987, states that:

> [a] member of the board of directors ... shall, in the performance of his duties, be fully protected in relying in good faith upon the records of the corporation and such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by *any other person* as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

*See* 66 Del.L.Chap. 136, § 3 (1987) (emphasis added).[10]

The directors of Technicolor argue that this 1987 statute applies here and absolves them from liability. This argument is premised on the assertion that the legislature intended the amended language to have a retroactive effect. Defendants note that the official commentary to the amendment indicates that the Delaware Legislature did not consider the new language as changing the existing law:

> Subsection (e) has been amended to *clarify* that directors may rely in good faith upon all corporate records, reports of employees and committees of the board and the written or oral advice or opinions of any professionals and experts who are selected with reasonable care and are reasonably believed to be acting within the scope of their expertise.

S.B. 93, 134th General Assembly 14, 66 Del. L.Chap. 136 (1987) (official commentary) (emphasis added).[11]

Based on this commentary, it is arguable that the legislature did not amend the language of § 141(e) to create a new defense for directors, but sought to ensure that directors would receive that degree of liability protection that was intended to be supplied by § 141(e) as originally enacted.

I need not express an opinion on this assertion as I conclude that in all events plaintiffs are not entitled to an award of damages on this record. I do, however, believe that reasonable reliance upon expert counsel is a pertinent factor in evaluating whether corporate directors have met a standard of fairness in their dealings with respect to corporate powers.

Turning from process to price, I have summarized the reasons why I find that the price received by the Technicolor shareholders was a fair one. Numerous reliable sources indicate that the $23 per share received constituted the highest value reasonably available to the Technicolor shareholders.

**10.** The prior version of Section 141(e) read in part as follows:

> A member of the board of directors of any corporation organized under this chapter ... shall, in the performance of his duties, be fully protected in relying in good faith upon the books of account or reports made to the corporation by any of its officers, or by an independent certified public accountant, or by an appraiser selected with reasonable care by the board of directors or by any such committee, or in relying in good faith upon records of the corporation.

**11.** *See also* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 4.7 (1993 Supplement).

At trial the court was presented with the results of two studies comparing the premium received in this sale with premiums received in comparable deals during the relevant period. The results provide significant evidence that the Technicolor shareholders were fully compensated for their relinquishment of control. The Alcar Comparable Deal Analysis demonstrated that among the 61 deals identified by the target's comparable size to Technicolor, the 109% "one-month deal premium" paid by MAF ranked fourth highest and was more than double the 51% average premium of these comparable deals. Furthermore, within Technicolor's industry MAF paid the highest premium amongst all acquisitions from 1981–84 and the premium was four times the average premium (26.55%) of the other six deals occurring within the industry during those years.

Additional facts strongly suggest that the $23 per share received would not have been exceeded had the Technicolor directors properly fulfilled their duties. For example, after considering engaging in an LBO, Technicolor's senior management declined to pursue the LBO and instead they sold their Technicolor shares to MAF. This fact that major shareholders, including Kamerman and Bjorkman who had the greatest insight into the value of the company, sold their stock to MAF at the same price paid to the remaining shareholders also powerfully implies that the price received was fair. *See Schlossberg v. First Artists Production Co.*, Del.Ch., C.A. No. 6670, 1986 WL 15143 Berger, V.C., slip op. at 18–19 (Dec. 17, 1986); *Yanow v. Scientific Leasing, Inc.*, Del.Ch., C.A. Nos. 9536, 9561, 1988 WL 8772 slip op. at 13, Jacobs, V.C. (Feb. 5, 1988, revised Feb. 8, 1988) (holding that the largest stockholder's acceptance of an offer constitutes *"prima facie* evidence that the offering price is fair"). I have stressed that the Technicolor/MAF negotiations occurred at arm's length which fact is itself somewhat supportive of the conclusion that the price achieved by the Technicolor directors satisfies the test of fairness. *Kahn v. Lynch Communication Sys.*, 638 A.2d 1110, 1115 (1994).

Finally, experts in the marketplace explicitly and implicitly indicated that the $23 per share price was fair and even the best price available. The Technicolor board's financial advisor, Goldman Sachs, opined that the price was fair after performing a number of different analyses, all of which are acceptable valuation bases. Goldman did conclude that a marginally higher price might be arranged for an MBO but even if one assumes that to be the case and infers from that that some buyer other than Perelman or management might have been able to pay such a price, such an inference would be supportive of the conclusion that $23 per share was an entirely fair price. The components of value in an acquisition might be considered to be two: the going concern value of the firm as currently organized and managed and the "synergistic value" to be created by the changes that the bidder contemplates (*e.g.*, new management, cost efficiencies, etc.). This second component will vary to some extent among bidders. It is the expectation of such synergies that allows a rational bidder to pay a premium when he negotiates an acquisition. Of course, no bidder will rationally pay more than a 100% of the expected synergy value to a seller, but in a competitive market of many buyers he may be driven to pay a substantial part of the expected synergy value in order to get the deal.

Here even if a few dollars more might have been financially rational to a buyer, the $23 price achieved reflected a more than "fair" allocation of synergy value to the sellers. If for example a $25 price might have been feasible (to MAF or someone else), that would mean that a $23 price represented 86% of the value in excess of the market price ($11) that a buyer foresaw he could achieve. A fair price does not mean the highest price financeable or the highest price that fiduciary could afford to pay. At least in the non-self-dealing context, it means a price that is one that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept. This price was certainly fair in that sense and given the entirety of the record I conclude that it was the highest value reasonably achievable. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr. 637 A.2d 34 (1993). *See also* p. 1150 below.

It is also worth noting that plaintiff provided meager evidence supporting a finding that $23 per share constituted an unfair price. Plaintiff suggested that the court must find that solely due to the directors' negligence the price and process could not be fair. Plaintiff's only other basis for such a finding was the testimony of plaintiff's expert, Mr. Torkelsen, whose methodology this court found to be "troub[ling]" and whose results were found to be "too strikingly odd to be accepted." *Cede & Co. and Cinerama, Inc. v. Technicolor, Inc.,* C.A. No. 7129, 1990 Del. Ch. LEXIS 171, 34, 52–53, 1990 WL 161084.

\*    \*    \*

Thus while I conclude that the process followed by the board in authorizing the corporation to enter into the MAF transaction was flawed in that, as found by the Supreme Court, the board was insufficiently informed to make a judgment worthy of presumptive deference, nevertheless considering the whole course of events, including the process that was followed, the price that was achieved and the honest motivation of the board to achieve the most financially beneficial transaction available, I conclude that the defendants have introduced sufficient evidence to support a conclusion that, and I do conclude that, the merger in which plaintiff was cashed out, as well as the tender offer in which MAF acquired the stock interest that enabled MAF to cash out plaintiff were fair transactions in all respects to Cinerama.

### III.  Rescissory Damages in General

In order to assist the efficient adjudication of this case, I set forth here my opinion with respect to the claim for rescissory damages. This question only arises if the foregoing determination of fairness of the transaction were to be found to be reversible error.  In that event, the expression of my considered judgment on the question of remedy at this time might allow the Supreme Court to address that question and thus save the time of a further proceeding on remand.

Plaintiffs assert that the Supreme Court has already determined that rescissory damages are to be assessed in this case.  This is I think a mistaken view.  The Supreme Court has not sought to cabin the shaping of

appropriate equitable relief by announcing a rule or a ruling to the effect that if this transaction were found not to have been entirely fair then rescissory damages would be required.

Indeed for the reasons that follow I am required to state the opinion that rescissory damages should never be awarded against a corporate director as a remedy for breach of his duty of care alone; that remedy may be appropriate where a breach of the directors duty of loyalty has been found, *see Weinberger,* 457 A.2d at 714 (holding that rescissory damages may be awarded if the lower court on remand finds them "susceptible of proof and a remedy appropriate to all the issues of fairness where the directors were on both sides of the transaction and did not deal fairly with the minority shareholders"); *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497 (1981) (holding that rescissory damages should be awarded where a majority shareholder did not disclose material facts surrounding its tender offer), but neither principle nor authority supports the awarding of rescission or a substitute for it against one who neither participates in the deal as a principal nor, is a co-conspirator of a principal or has a material conflict of interest of another sort.  I need to explain this interpretation of our law.  I start with some general legal background.

In a mechanical way, rescissory damages function to put a party in the same financial position it would have occupied prior to the initiation of a transaction which is found to be invalid or voidable.  This remedy is applied when equitable rescission of a transaction would be appropriate, but is not feasible. At the most general level, this remedy is premised upon the idea that (1) the transaction whereby the party gave up an asset was wrongful in some way and (2) the nature of the wrong perpetrated is such that plaintiff is entitled to more than his "out-of-pocket" harm, as measured by the market value of the asset at or around the time of the wrong. A review of the case law shows two prevailing "strains" of the remedy of rescissory damages.  The first grows out of, and is closely connected to, restitutionary relief. The second theory (and the more prominent

one) employs a liberal application of the compensatory theory of damages against trustees who commit egregious breaches of the express terms of a trust or who self-deal.

### (1) *Rescissory Damages as a form of Restitution*

This incarnation of rescissory damages has surfaced in securities law; in particular in actions under Section 10(b) of the Securities and Exchange Act of 1934. The general rule is that a defrauded seller of securities will be entitled to her out-of-pocket damages, measured by the value of the security at a time period reasonably close to the point at which the seller received notice of the fraud. The seller will also be entitled, however, to additional damages if the stock appreciated after the sale *and* the buyer profited as a result. While the core of this latter remedy is clearly restitutionary, at least one prominent decision has referred to this theory of relief as a manifestation of the rescissory damages concept. *See Myzel v. Fields,* 386 F.2d 718 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

More pertinent to this Court's present analysis is the Delaware Supreme Court's decision in *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497 (1981), *overruled in part,* Del.Supr., 457 A.2d 701 (1983). In that action, plaintiffs were minority shareholders who sued the corporate majority shareholder and its directors for breach of candor in connection with a tender offer. Following a Supreme Court determination that the defendants had breached a duty of candor, this court held that recovery would be limited to plaintiff's "out-of-pocket" damages. This

remedy would be measured by the fair value of the stock at the time of the tender offer. The Court of Chancery applied the analysis then utilized in a statutory appraisal to determine the remedial amount.

The Supreme Court reversed this decision. The Court held that while an "out-of-pocket" damages approach would have been appropriate in an action alleging fraud or misrepresentation, this was not proper in a claim for breach of fiduciary duty by a controlling shareholder. Specifically, the court concluded that in such an action, plaintiffs should be entitled, as a matter of law, to damages measured by the fair value of the stock at the time of judgment, *i.e.*, rescissory damages.[12]

In analyzing *Lynch* and *Weinberger* it is critical to keep in mind that both of these cases involved controlling shareholders proposing or effecting self-interested deals. In all events, the Supreme Court's *Lynch* opinion relies upon restitutionary concepts to justify the award of rescissory damages:

> Here, we focus on the principle which prohibits a fiduciary from keeping what he *acquired* in a transaction preceded by less than a fair disclosure of facts germane to the transaction.

*Lynch,* 429 A.2d at 504. The principal cases relied upon by the Supreme Court in this connection themselves relied upon the restitutionary idea of precluding unjust enrichment.[13] Notably, in *Vickers* the court dismissed the directors of the parent corporation (who did not personally profit from the tender offer). That fact is consistent with the interpretation that restitutionary theory of rescissory damages explains the *Lynch*

---

**12.** The Supreme Court's holding in *Lynch* was reversed in part by its subsequent holding in *Weinberger, supra. Weinberger* reversed the Supreme Court's *requirement* that rescissory damages be afforded to remedy a valid claim for breach of fiduciary duty in a cash-out merger by a controlling shareholder. The *Weinberger* court ruled: "To the extent that ... [Lynch] purports to limit the Chancellor's discretion to a single remedial formula for monetary damages in a cash-out merger, it is overruled." *Weinberger, supra* at 715. The court held also that in a cash-out merger, rescissory damages might be awarded if capable of proof and appropriate under the circumstances.

**13.** The Supreme Court relied extensively on *Myzel v. Fields, supra* and *Janigan v. Taylor,* 344 F.2d 781 (1965). Both of these cases involved a court awarding (or permitting the award of) damages to the extent of a defrauding buyer's unjust enrichment. The Supreme Court also relied a great deal on *Mansfield Hardwood Lumber Co. v. Johnson,* 263 F.2d 748 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959). In this case, a corporation was sued by its shareholders for fraudulently inducing them to sell back their stock at a price well below their actual value. The Court of Appeals, in awarding plaintiffs the value their stock would have obtained in the subsequent liquidation of the company, explicitly relied upon a theory of restitution.

result.[14] To the extent that the *Lynch* reasoning with respect to rescissory damages remains the law, I conclude that it focuses upon the "unjust enrichment" or restitutionary theory. This theory does not reach corporate directors who are disinterested and independent but inadequately informed.

### (2) *The Compensatory Theory of Rescissory Damages*

The second theoretical basis for rescissory damages grows out of trust law. Trustees have been surcharged for the appreciated value (at the time of judgment) of property they sold (1) in violation of their obligations under the trust instrument or (2) in a transaction in which they labored under a material conflict of interest. In both of these situations, courts have justified this surcharge as an attempt to render the beneficiary whole for all of the damages he has suffered as a result of the breach of trust. *See In the Matter of the Estate of Rothko*, 401 N.Y.S.2d 449 (1977); *see also In re Estate of Anderson*, 149 Cal.App.3d 336, 196 Cal.Rptr. 782 (1983) (awarding appreciation damages against trustee who was grossly negligent *and* who had breached its duty of loyalty by, *inter alia*, failing to give adequate notice to beneficiaries of important transactions). Indeed, in the cases where a trustee is surcharged (for the appreciated value of proper-

ty) because he failed to follow the dictates of the trust instrument, the remedy is purely compensatory (not restitutionary) since the trustee is not even accused of advancing his self-interest via the transaction.

As explained more fully below, trustees are not held liable for appreciation damages when they are only guilty of negligence. Only if a trustee had an affirmative duty not to sell the asset or sold the asset to benefit her own self-interest will she be required to return a trust beneficiary to the position she would have been in but for the sale.[15] Where a trustee is authorized to sell trust property and merely sells it for less than a prudent seller would get:

> he is liable for the value of the property *at the time of the sale less the amount which he received.* If the breach of trust consists only in selling it for too little, he is not chargeable with the amount of any subsequent increase in value of the property [as he would be] . . . if he were not authorized to sell the property.

Restatement (Second) of Trusts § 205 cmt. d (1959) (emphasis added). Only in instances of self-dealing or breach of an affirmative term of the trust is it deemed equitable to impose upon the trustee the risk of future fluctuations in the market value of the asset.[16]

**14.** Vice Chancellor Chandler also treated rescissory damages as a restitutionary remedy in *Russell v. Morris*, Del.Ch., C.A. No. 10009, Chandler, V.C., 1990 WL 15618 (Feb. 14, 1990). The facts of that case, however, do not suggest that any unjust enrichment had, in fact, occurred. The plaintiff was one of three directors of a corporation, each of whom controlled one third of the company's stock. The suit alleged that the two other directors had effectuated a sale of substantially all of the company's assets in contravention to the requirements of § 271. The court rejected defendants' motion for partial summary judgment on plaintiff's request for rescissory damages. The court found that rescissory damages might be especially appropriate, because plaintiff himself was not responsible for rescission being impossible. While that case did not actually fix an award of rescissory damages it does have the flavor of a breach of loyalty case. It is analogous to the trust cases, cited *infra*, addressing a trustee's breach of an express limitation in the trust.

**15.** *See, e.g.*, 3 *Scott on Trusts* § 208.3 (3d ed. 1967):

> While [an] executor who sells trust property in breach of trust is ordinarily liable for

value of [the] property at time of sale and not for appreciated value thereof if his breach is only in selling at too low a price, appreciation damages are appropriate if [the] executor was under duty to retain interest or if breach consisted of serious conflict of interest.

If the transaction was not self-interested, therefore, the trustee is only surcharged for the value of the property at the time of the suit where he sold the property without *authority* to do so. The only analogous situation in the corporate universe would be where directors effect an ultra vires sale. The Technicolor directors in contrast, undoubtedly had authority to enter the MAF merger agreement and recommend the acceptance of the tender offer.

**16.** *See In re Talbot's Estate*, 141 Cal.App.2d 309, 296 P.2d 848 (1956). In that case, the Court found that the trustee did not exercise his independent judgment in selling trust property and instead relied on an income beneficiaries' belief that certain stock should be sold, thus breaching his duty of care. The Court, however, determined that the proper measure of damages was

In an opinion which foreshadows some of the concerns of a court adjudicating a personal liability action against corporate directors, the New York Court of Appeals explained why a similarly broad view of compensatory damages would not be afforded a beneficiary for the mere negligence of a trustee:

> The reason for allowing appreciation damages, where there is a duty to retain, and only date of sale damages, where there is authorization to sell, is policy oriented. *If a trustee authorized to sell were subjected to a greater measure of damages he might be reluctant to sell* (in which event he might run a risk if depreciation ensured). On the other hand, if there is a duty to retain and the trustee sells, there is no policy reason to protect the trustee; he has not simply acted imprudently, he has violated an integral condition of the trust....
>
> These are not punitive damages in a true sense; rather they are damages intended to make the estate whole.... these damages might be considered by some to be exemplary in a sense, in that they serve as a warning to others ... but their true character is ascertained when viewed in the light of overriding policy considerations and in the realization that the sale and consignment were not merely sales below value but inherently wrongful transfers which should allow the owner to be made whole. *In the Matter of the Estate of Rothko, supra* at 456. (emphasis added)

\* \* \*

I take it as clear that if rescissory damages were appropriate here, it would have to be under the theory of the trust cases applying a compensatory approach to this remedy. Plainly, the Technicolor directors did not, in

the traditional sense, profit at the plaintiff's expense via the MAF acquisition. Indeed, directors Kamerman and Bjorkman received the same price for their stock as did plaintiff. I turn then to the question whether the directors' conduct is more closely analogous to the negligent trustee only liable for "out-of-pocket" damages, or to the trustee who has committed a breach of trust sufficient to justify appreciation, or rescissory damages.

## IV. Unavailability of Rescissory Damages Against Corporate Directors In This Case

■ Cases holding directors liable for a breach of the duty of attention or care, uncomplicated by self-dealing or conflict of interest are rare. *See, e.g.,* Joseph W. Bishop, Jr., *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers,* 77 Yale L.J. 1078 (1968). One authority identifies only ten modern cases as finding actionable director negligence without a concurrent breach of loyalty or conflict of interest. *See* Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 72–75 (4th ed. 1993). Of those cases in which liability has been imposed upon directors for failure to act on an informed basis, none has employed a rescissory damage measure of remedy. Date of transaction or out-of-pocket damages have been the sole remedy afforded. *E.g., Doyle v. Union Insurance Co.,* 202 Neb. 599, 277 N.W.2d 36, 44–45 (1979); *see also Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112 (4th Cir.1989), *rev'd on other grounds,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (holding that the damages resulting from a lack of proxy disclosure amounted to the difference between the offer price and the fair value at the time of the proxy).[17]

---

"limited to the loss to the corpus, plus interest." *Id.* at 859. The Court specifically refused to impose "liability for loss of all income and appreciation that would have resulted had the sale not been made." *Id.* The Court held that to require the trustee to account for appreciation would wrongfully place the trustee who acted in good faith in the same position as one who defrauds or breaches his duty of loyalty. The "moral turpitude" existing in such case was absent where only the duty of care was breached. *Id.*

17. The remaining cases identified by Block, Barton and Radin involved direct losses to the corporation due to negligence, not loss of appreciation which could have accrued to the benefit of the shareholders but for the directors' negligence. In these cases as well, courts did not calculate damages to include the appreciated value of a lost opportunity. *See, e.g., Hoye v. Meek,* 795 F.2d 893 (10th Cir.1986) (directors liable for the actual losses incurred due to their negligent investing); *Brane v. Roth,* 590 N.E.2d 587 (Ind.

The lack of authority actually imposing rescissory damages on a corporate director in a negligence case, should not itself be fatal to plaintiff's claim. It does require us to move to the level of principle and policy. That deeper analysis must begin with trust law, which provides a fertile, if sometimes risky, analogy for corporate law.

But before undertaking that analysis, it is important to note the ways in which trust law differs from corporate law. In general, the duties of a trustee to trust beneficiaries (those of loyalty, good faith, and due care), while broadly similar to those of a corporate director to his corporation, are different in significant respects. Corporate directors are responsible for often complex and demanding decisions relating to the operations of business institutions. The nature of business competition insures that these directors will often be required to take risks with the assets they manage. Indeed, an unwillingness to take risks prudently is inconsistent with the role of a diligent director. The trustees role is, classically, quite different. The role of the trustee is prudently to manage assets placed in trust, within the parameters set down in the trust instrument. The classic trusteeship is not essentially a risk taking enterprise, but a caretaking one. Hence, while trustees may be surcharged for negligence, a corporate director is only considered to have breached his duty of care in instances of gross negligence.

The duty of loyalty of a trustee also developed differently than that of a corporate director. Traditionally a trustee could not enter self-dealing transactions, even if the transaction was in all other respects, fair. Modernly at least, corporate directors may negotiate transactions with respect to which they "stand on both sides" if the terms of the deal, and the process by which it was negotiated are entirely fair. *See* 8 *Del.C.* § 144. This reflects a significant difference in the expectations of the parties to these two relationships. A trusteeship from its inception has been imbued with a moral element; it is considered fundamental that trustees avoid even the appearance of dishonesty or disloyalty to maintain the integrity of this institution. The essence of the director-shareholder relationship while not devoid of moral overtones is more firmly grounded in economics: shareholders expect, and directors are required to avoid only those self-interested actions which come at the expense of the corporate or its shareholders.

The differing nature of the duty of loyalty in these relationships is also reflected in the idea that a trustee's failure to adhere to the requirements set down in the trust instrument is itself a breach of loyalty. A trustee's obligation flows to both the beneficiary, the person for whose benefits the assets are held, as well as the settlor, who often gives specific instructions which constitute an essential aspect of the "trust" placed in the trustee. When a trustee fails to fulfill the dictates of the trust instrument, he has failed in his obligation to the settlor to loyally carry out the settlor's wishes. In corporation law, by contract, such a concept is alien. Typically the certificate of incorporation confers broad minimally constrained authority upon the board to engage the corporation in business in all lawful ways.

These distinctions between trust law and corporate law, while of tone and tenor, are important. They do suggest that, insofar as negligence uncomplicated by a breach of loyalty is concerned, important policies having to do with the nature of the legal institutions of trust and of corporation require that the corporate liability rule should certainly remain less stringent than that of the trust law. To the extent that corporate directors are exposed to liability for negligence under a rescissory damages formula, their ability to fulfill their basic function as prudent risk-takers may be hindered. Indeed, the quoted language of the *Rothko* court above (p. 33) has a special pertinence to corporate law, when one recognizes that the corporate law has long realized that mergers are an important form of wealth enhancing activity. The statutory law in Delaware, as elsewhere, has

Ct.App.1992) (awarding damages equal to the loss suffered by the corporation attributable to the directors' negligent failure to hedge grain futures); *Francis v. United Jersey Bank,* 432 A.2d 814 (N.J.1981) (holding a director liable for corporate funds misappropriated by corporate officers).

been repeatedly amended over this century to make the effectuation of mergers easier. Mergers can facilitate wealth creation; they are favored for reasons of policy. *See MacFarlane v. North American Cement Corp.,* Del.Ch., 157 A. 396, 398 (1928); *Hottenstein v. York Ice Machinery Corp.,* D.Del. 45 F.Supp. 436 (1942) *aff'd* 136 F.2d 944 (3rd Cir.1943). If disinterested and independent directors who proceed, upon competent advice, to authorize a merger are thereby exposed to market risk of the value of the company should they later be found to have been inadequately informed, one might well expect fewer mergers to eventuate.

\*       \*       \*

The question is, given the foreseeable effect of imposing such a remedy, and the lack of precedent for it, whether the breach of duty that occurred here nevertheless justifies it. For the reasons that follow, I conclude that it does not.

First, I believe that the corporation law should in no event be stricter than the trust law precedent that a fiduciary guilty of pure negligence should not be liable for "appreciation" or rescissory damages.[18] The fact that the directors here have presumably been found liable for gross negligence does not affect this conclusion. Indeed, the higher standard of negligence for corporate directors reflects a policy choice that directors need greater latitude than a traditional trustee, a policy which would be counteracted by applying rescissory damages in this context.

Second, I conclude that the Technicolor directors were not materially influenced by

any interest in the transaction in a way analogous to the trust cases where the court found a "breach of trust" and applied a rescissory damages remedy. This inquiry is different, although related to, the evaluation of directorial self-interest for purposes of rebutting the business judgment presumption, which was dealt with at length in the earlier June 21 Opinion. At stake in resolving this latter issue is purely the degree of scrutiny to which a board's decisions will be subject. At stake presently is the scope of the board's liability. Thus, while the former issue involves an evaluation of the circumstances that might plausibly or did affect the board's decisionmaking, the latter raises a question of the degree of actual misconduct by the director vis a vis the shareholder. Thus, at a minimum persuasive evidence that the board was actually motivated by interests other than those of the shareholders would be necessary, in my opinion, to support a rescissory damage award in this context. While this may arguably be a departure from the broad view of a trustee's duty of loyalty taken by some courts, it is in my opinion consistent with the core idea of these, and other trust cases.[19] In all events, I find it appropriate to apply a less severe rule for corporate directors than might be applied to a traditional trustee, for the reasons discussed above.

I conclude that there is no cogent evidence that the Technicolor Board, in any material respect, put their interests ahead of the shareholders negotiating the sale of the company. While in a classic self-dealing transac-

---

**18.** In *Doyle v. Union Insurance Co.,* 277 N.W.2d 36 (Neb.1979) the Nebraska Supreme Court, having found directors to have negligently sold the company's assets for less than their value at the time of the sale relied on trust law principles to determine the measure of damages on this basis, the Court affirmed the trial court's determination that the damages equalled "the difference between the price for which the property was sold and its fair and reasonable market value at the time of the sale." *Id.* at 44–45.

**19.** In *Rothko, supra,* the court awarded rescissory damages against two of three trustees, who supervised the disposition of the Rothko Estate. One of the trustees held liable was a director of the acquiring corporation, the other had an employment contract with it. The third trustee,

who was merely negligent, was only held liable for out-of-pocket damages.

This case, in my opinion, demonstrates the point that an award of rescissory damages is predicated upon the idea that a trustee's self-interest actually polluted his decision. Not only were the trustees self-dealing in the classical sense (which supports a strong inference that their judgement was corrupted), but the Rothko estate's paintings were sold at a dramatically undervalued price. Thus, the court had evidence that (1) the circumstances were such that the director's duty to the beneficiaries were significantly in conflict with his self-interest and (2) that the transaction was implemented under terms consistent with the conclusion that the director actually pursued his self-interest in negotiating it.

tion, the fact that a director gained a direct and compelling benefit from the deal would support a strong inference that self-interest actually influenced his behavior, this is not the case in an arm's-length merger such as this one. Here, the benefits received by a minority of the board are much less compelling. I have already stated my conclusion that with the exception of Mr. Sullivan, and potentially Mr. Ryan, none of the other Technicolor directors labored under a conflict of interest which would have been material to a reasonable person. On this remand I further conclude here that there is no persuasive evidence that any of the directors were, in fact, materially influenced in their negotiations by any self-interest they may have had. Good evidence of this is the arm's-length nature of the negotiations themselves, which commenced at a proposed deal at $15 per share, and gradually climbed to the deal price of $23 per share. Also significant is the powerful evidence that the price paid by MAF was fair—that the directors did in fact successfully promote the interests of the shareholders. Thus, unlike *Rothko*, there is here no powerful empirical evidence to show that the director's judgment was in fact tainted, as borne out by an inadequate price.

Finally, while the board's failure to adequately canvas the market may arguably be consistent with the idea that they were committed, out of self-interest, to the transaction with Perelman, I do not make this inference. First of all it makes no economic sense given the stockholdings of Mr. Kamerman and Bjorkman.[20] Moreover, the board made this decision on the advice of experienced corporate counsel.[21] They thought they had negotiated a good transaction for the shareholders, and did not want to take steps which might jeopardize it. No improper motive, insofar as the evidence suggests, underlay this decision. In my opinion, the record strongly supports a finding that the directors were motivated by the best interests of the shareholders in negotiating the transaction with MAF.

Under all of the circumstances, no award of rescissory damages would be appropriate, in my opinion.

\*     \*     \*

■ The only remedy to which the plaintiff could be entitled is an award of its out-of-pocket loss caused by the directors' found breach of duty. In order to make such an award the court would have to conclude that there was some creditable basis in the evidence to find that a price higher than $23 per share was reasonably likely to have emerged if the directors had sought it out. The balance of the evidence is inconsistent with such a conclusion, however. On the contrary, there is evidence (a preponderance) that the price was full and fair.

In this regard, plaintiff's reliance on Mr. Torkelson's valuation of the company to calculate the price the board would have achieved absent a breach of duty is misplaced. First, this valuation was rejected in the appraisal opinion as distorting the actual value of the going concern. While the appraisal value is different than the sale of the firm value, Mr. Torkelson's testimony is no less flawed in this setting than in that one. Second, opinion evidence, unsupported by some evidence that a bidder would actually have been interested in paying such a price, provides a frail, and here inadequate, support for a damage award. Moreover plaintiff's expert created estimates that were so radically at odds with NYSE market values that even considering the addition of a control premium, they strain credulity to well past the snapping point. For the foregoing reasons, I conclude that defendants' have satisfied their burden of showing that their breach of duty resulted in the Technicolor shareholders receiving no less consideration for their Technicolor shares than they would otherwise have.

### V.

I now turn to an attempt to follow the Supreme Court's directions with respect to the Technicolor board's independence and

---

**20.** As found earlier the argument that Kamerman had a dominant interest as an officer in his contract is utterly unconvincing and was rejected.

**21.** *See* pp. 18–20 *supra.*

disinterest, summarized at page 366 of its reported opinion. First I revisit the issue of what standard should be applied to determine whether an individual director is interested in a transaction. Next I address the test determining whether the board as a whole has been tainted by the existence of one or more interested directors. Finally, I consider the effect, if any, the Technicolor's charter provision requiring directorial unanimity has upon the duty of loyalty. As is clear from what has already been said, this analysis continues to lead me to the fundamental fact, which I do find, that a large majority of the board of Technicolor was disinterested and independent with respect to this transaction and neither of those two directors found or assumed to be interested dominated or manipulated the process of board consideration. *See Paramount Communications, Inc. v. QVC Network, Inc.,* Del. Supr., 637 A.2d 34 (1993).

### A. Materiality of Claimed Interest

The Supreme Court affirmed that not every financial interest in a transaction that is not shared with shareholders would necessarily be sufficient to trigger application of the entire fairness form of judicial review. 634 A.2d at 363. Thus materiality of any such interest is a conceptually necessary (but perhaps practically infrequent) step in an analysis of whether a board decision is to be reviewed under the business judgment format or under an entire fairness structure. The June 21 Opinion analyzed the materiality of claims of conflicting interest of the five of the nine Technicolor directors who arguably had such an interest. *See* June 21 Opinion at 27–36. The standard applied by this court had been the "objective," reasonable person standard:

> "Material" in this setting refers to a financial interest that in the circumstances created a reasonable probability that the independence of the judgment of a reasonable person in such circumstances could be affected to the detriment of the shareholders generally.

*Id.* at 36.

With respect to the standard to judge whether a director's financial interest is ma-

terial the Supreme Court stated that "the Chancellor's use of the reasonable person standard is unhelpful and, indeed, confusing. Therefore we reject its use in resolving whether evidence of director self-interest is sufficient to rebut the rule." 634 A.2d at 364. The Supreme Court did not inform this court of the proper test to be applied; rather it remanded the point for further consideration.

■ The rejected test for a material conflicting interest is objective (as lawyers use that term), referring not to the effect that a financial interest had or would have on the particular party, who may have eccentric characteristics, but to the effect that one would expect such an interest to have on a hypothetical "reasonable person." *Cf. Basic v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449–52, 96 S.Ct. 2126, 2132–34, 48 L.Ed.2d 757 (1976) (adopting "reasonable shareholder" test of materiality in federal disclosure context). One possible alternative to this "reasonable person" test would be an "actual person" test of materiality, focusing on the effect of the financial interest in fact had on the actual director in question. Under such a test of materiality the court would be required to determine *not* how or whether a reasonable person in the same or similar circumstances of exercising a corporate responsibility would be affected by a financial interest of the same sort as present in the case, but whether *this* director in fact was or would likely be affected. If the rejection of reasonable person standard is to be confirmed, then I suppose that such a particularized (or subjective) test would be the most likely alternative.

Logically, application of a particularized or subjective test rather than the more widely used reasonable person standard to the question of the materiality of director interest might lead to a different result than that reached under the objective test only if the individual director that is the subject of the analysis is shown by the evidence to have some special characteristic that makes him or her especially susceptible to or immune to opportunities for self enrichment or if there is persuasive evidence that he or she in fact behaved differently in this instance than one

would expect a reasonable person in the same or similar circumstances to act. In my opinion sufficient evidence does not exist in this record to support such a conclusion with respect to any of the Technicolor directors previously found not to have had a material self interest in this transaction.

■ The June 21 Opinion set forth the grounds leading to the conclusion that no director other than Mr. Sullivan could be found to have a material conflict of interest with respect to the MAF transaction. As to Mr. Ryan I concluded that there was no persuasive evidence of a promise or understanding that he would profit from an MAF takeover. It was apparent that he and Kamerman had poor relations and I concluded that "it is unknowable whether his judgment was affected" by his dislike for Mr. Kamerman. Applying an objective test, I assumed for purposes of argument that he was subject to a material conflict. (June 21 Opinion at 34). *See* n. 8 *supra.* The evidence with respect to Mr. Kamerman's various interests (as a substantial shareholder, as C.E.O. as director, etc.) is reviewed in this court's earlier opinion and the conclusion reached that "looking at them together, I cannot conclude that ... [they] created any significant incentive for Mr. Kamerman not shared by other shareholders to promote sale of the company or sale of the company to MAF in particular." (June 21 Opinion at 31). There is no evidence in the record that persuades me that if one asks the particularized question whether these various interests in fact interfered with Mr. Kamerman's seeking to get the best possible transaction for the Technicolor shareholders one could reach the opposite conclusion than that reached under the test employed in the June 21 Opinion.

I conclude similarly with respect to each of the corporate directors treated in this court's opinion; analysis of actual interference with the directors' good faith judgment seeking the shareholder's best benefit does not produce a different result than does the "reasonable person" analysis.

In candor this is unsurprising. On the contrary if a judge employing a reasonable person standard concluded that in fact a director's judgment *was* affected by a factor

or interest *that would not have affected a reasonable person*, it would be surprising if he would conclude that nevertheless there was no material conflict. The advantage of the reasonable person standard is that it does not call upon the court to evaluate the effect of eccentricities but leaves the question of materiality as an "objective" matter. But if the evidence shows that an "objectively" immaterial conflicting interest *in fact* did have a significant impact on the particular directors in question there is room in the "independence" prong of the analysis to give that fact a disqualifying effect insofar as that director is concerned and one would expect a trial court to avoid obvious injustice by doing so. Thus while the June 21 Opinion spoke in terms of a "reasonable person" and did not express that in fact these claimed interests did not interfere with process to achieve stockholder's welfare, that was my belief.

## B.

In its opinion the Supreme Court stated: Largely without explanation, the Court of Chancery concluded that Sullivan's finder's fee, while materially affecting his own independent business judgment, was not a material interest affecting the transaction overall because the board had approved the transaction after Sullivan's interest had been disclosed. Section 144(a) may arguably sustain this finding. *See Fliegler*, 361 A.2d at 222. Unfortunately, neither the court below nor the parties have brought section 144(a) into their reasoning or analysis.

*Cede & Co.*, 634 A.2d at 365.

The Court then directed this court that: Those issues requiring resolution on remand relating to the duty of loyalty are: (1) the precise standard of proof required under the second part of the materiality standard (*see* n. 32 *supra*); (2) the legitimacy of such a standard under Delaware law and the relevance of section 144(a);
...

*Id.* at 366.

In referring to the second part of the materiality test the Supreme Court was referring to the view expressed in the June 21

Opinion that not every material self-interest of a single director (for example) would necessarily shift to the director defendants the burden to prove the entire fairness of a transaction and expose them all to equitable remedies if, in retrospect, the transaction did not appear to be at a fair price. Again, this Court assumed that this was standard doctrine. For example, in the recent *QVC* case the Supreme Court noted in passing that:

> where actual self-interest is present *and affects a majority of directors approving a transaction,* a court will apply even more exacting scrutiny to determine whether the transaction is entirely fair.

*Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 42 n. 9 (1993) (citing *Weinberger* and *Nixon,* 626 A.2d at 1376). In all events, this court concluded that under the circumstances present in this case Mr. Sullivan's material self interest in the transaction (or Mr. Ryan's assumed conflicting interest) did not itself authorize the shifting and enhancement of burdens that the Delaware business judgment rule contemplates.

The Supreme Court has remanded the case, in part, for further consideration of what it called the "second step" of the materiality question. For clarity, I suppose it may be helpful to limit the term "materiality" to the question whether a claimed financial interest of a director is such as to have actually (under the required subjective test of materiality) interfered with the director's exercise of her business judgment.[22] Once one or more directors are seen as having a material interest in the transaction adverse to the corporation or its shareholders, the question whether such interest[s] has the effect of invoking the burdens, and remedies of the entire fairness test might perhaps be referred to by another title, such as the "instrumentality," the "dominance," or the "significance" issue. By whatever name the issue is identified, the central inquiry is the same: Has the presence of the found material self interest of one or more directors on the board that acted upon a transaction so infected or affected the deliberative process of the board as to disarm the board of its presumption of regularity and respect and cast upon the directors the burden (and the heightened risks, *see* June 21 Opinion at p. 25) of the entire fairness form of judicial review.

■ In my opinion a financial interest in a transaction that is material to one or more directors less than a majority of those voting is "significant" for burden shifting purposes (or is "instrumental" or "material under the second part of the materiality standard") when the interested director *controls* or *dominates* the board as a whole or when the interested director *fails to disclose his interest* in the transaction to the board *and* a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction. In such circumstances the interested director cannot plausibly claim that the appropriate board processes upon which investors are required to place their trust, functioned and thus he cannot plausibly claim the benefits of the normal presumptions. Such a director would be required to prove the entire fairness of the transaction and face the risks of equitable remedies should he fail to do so. In my opinion, in such a circumstance, the non-interested directors who are merely subject to the domination of the controlling, interested director or who are innocent victims of the non-disclosure of an interest that is both material to an interested director and significant to the board's decision would also be required to show the entire fairness of the transaction (if the corporation does not or cannot avoid the contract), but the particularities of the case (the directors' good faith if present, for example) would be considered were the court required to fix a remedy with respect to such directors.

\* \* \*

■ The Supreme Court has mandated that this court consider the applicability of Section 144 of the General Corporation Law to the facts as found. As the Court noted,

---

**22.** Under the rejected "objective" or reasonable person standard of course the test would be formulated somewhat differently.

the application of that provision was not argued before this court. That statute does not deal with the question when will a financial interest of one or more directors cast on the board the burdens and risks of the entire fairness form of judicial review. Rather it deals with the related problem of the conditions under which a corporate contract can be rendered "un-voidable" solely by reason of a director interest. These two problems—when will a director interest replace business judgment form of review with entire fairness form of review and when are interested contracts not necessarily voidable—are related in that both focus upon the effect of action by an "independent" corporate decision maker. But as construed by our Supreme Court recently compliance with the terms of Section 144 does not restore to the board the presumption of the business judgment rule; it simply shifts the burden to plaintiff to prove unfairness. *See Kahn v. Lynch Communication Systems,* Del.Supr., 638 A.2d 1110 (1994).

The inquiry whether a board is independent and disinterested, etc. for purposes of determining whether it qualified for the business judgment rule presumption is somewhat similar to this Section 144 analysis but it can't be the same, since the business judgment form of review analysis inquiry must admit of the possibility that, if there is no material interference with the independence of the board's process, that business judgment review is possible.

In all events, the policy of Section 144 is highly consistent with the approach the June 21 Opinion took; it was found that the interest of Mr. Sullivan was disclosed and a majority of the non-interested directors approved the transaction in good faith. *See* 8 *Del.C.* § 144(a)(1) (1991, 1992 pocket part). As to the assumed interest of Mr. Ryan, it is clear under the language of the statute, that the alleged hope of better employment opportunities does not constitute the kind of interest covered by Section 144.

## C.

■ The Supreme Court inserted into the case what it took to be a "further significant issue that neither the parties nor the court below has addressed; that is the relevance of Technicolor's charter requirement of director unanimity to the consequences of a finding of director self-interest." *Cede & Co.,* 634 A.2d at 365. The Supreme Court pointed to three issues that it saw as possibly raised by this provision:

> If unanimity is required, will one director's self-interest or lack of independence violate the requirement? Do the provisions of section 144 override a charter requirement of unanimity? Does full disclosure of a director's interest to an otherwise disinterested board satisfy Technicolor's unanimity requirement?

*Id.* at 366 (footnote omitted). For the reasons set forth below, in my opinion the answer to the first of these question is plainly no. The remaining questions thus need not be addressed.

The Technicolor supermajority provision required a 95% stockholder vote to approve a merger with any entity holding 20% or more of Technicolor's stock on the record date for the merger vote. (Technicolor Charter (PX 1) Art. 10(2)) The "unanimity requirement" to which the Supreme Court referred is a requirement that only unanimous board action can amend or repeal the supermajority requirement. The language governing repeal of the supermajority provision reads as follows:

> No amendment to the Restated Certificate of Incorporation of the Corporation shall amend, alter, change or repeal any of the provisions of this Article Tenth, unless the amendment effecting such amendment, alternation, change or repeal shall receive the affirmative vote of the holder of at least ninety-five percent (95%) of the outstanding shares of capital stock of the Corporation entitled to vote in elections of directors, considered for the purposes of this Article Tenth as one class; provided that *this paragraph 5 shall not apply to,* and such ninety-five percent (95%) vote or consent shall not be required for, *any amendment,* alternation, change or repeal *unanimously recommended to the stockholders by the Board of Directors of the Corporation if all of such directors are persons who would be eligible to serve as*

*"Continuing Directors"* within the meaning of paragraph (3) of this Article Tenth. (*Id.* Art. 10(5)) (emphasis added). In order for directors to be qualified to participate in the required unanimous board action the charter provides only one criterion that must be met: the directors must be "persons who would be eligible to serve as 'Continuing Directors' within the meaning of paragraph (3) of this Article Tenth."

Paragraph (3) provides:

The term "Continuing Director" shall mean a person who was a member of the Board of Directors of the Corporation elected by the stockholders prior to the time that [the merger partner] acquired in excess of ten percent (10%) of the stock of the Corporation entitled to vote in the election of directors, or a person recommended to succeeded a Continuing Director by a majority of Continuing Directors then serving on the Board of Directors.

(*Id.* Art. 10(3))

In this case the Technicolor board unanimously voted to amend the supermajority voting requirement at the same meeting at which it approved the MAF deal. Each director comprising the unanimous Board that recommended repeal of the supermajority provision met the charter definition of a "Continuing Director." Each was elected prior to MAF's acquisition of *any* Technicolor stock.

While supermajority voting provisions are, of course, valid when properly adopted, they do represent an intrusion upon what would otherwise be the statutory norm of majority rule. *Centaur Partners IV v. National Intergroup, Inc.*, Del.Supr., 582 A.2d 923 (1990); *Rainbow Navigation Inc. v. Yonge,* Del.Ch., C.A. No. 9432, Allen, C., 1989 WL 40805 (Apr. 24, 1989). As such they should be strictly construed to afford full effect to their terms but should not be extended by liberal interpretation.

Plainly a literal interpretation of the unanimity requirement shows that it was satisfied in this instance. No director voting at the October 1981 meeting had been elected after MAF "acquired in excess of ten percent (10%) of the stock of the Corporation." Provisions in a corporate charter should receive a literal and technical interpretation in most instances. They are customarily drafted by experts who count on them being respected in a precise and literal way. The issue to which the Supreme Court directs our attention—whether one who meets the technical requirements of a continuing director should nevertheless be regarded as a "non-continuing director" because he has a (disclosed) conflicting interest in the transaction, is fully answered I believe by the requirement that, absent fraud or mutual mistake, courts respect and enforce the literal language of the constitutional documents of a corporation.[23]

## VI.

For the foregoing reasons I conclude that the MAF transaction was in all respects fair to the shareholders of Technicolor and that as a consequence neither the directors of the company nor the acquiring company have any liability to plaintiff. The case will therefore be dismissed. Defendants may submit an appropriate form of order on notice.

23. One element of the initial remand of the case directed this court to clarify the meaning of a sentence on page 63 of the June 21 Opinion. This court did so in a submission of January 7, 1994. Thereafter on January 18 the Court affirmed the "finding that the defendant directors did not breach their duty of disclosure ... in failing to disclose [any] material self-interest [of Mr. Ryan]. On reargument of that determination the Court affirmed that conclusion but again remanded for this court to further consider the question of the non-disclosure of Mr. Ryan's [assumed] conflict of interest in the light of "Technicolor's Charter requirement of director unanimity." As the conclusion stated in text is that that charter requirement was fully complied with, I cannot find in it material to construct a disclosure violation as plaintiff seeks.