## BENSIEK et al. v. THOMAS et al.

### (Circuit Court of Appeals, Eighth Circuit. February 11, 1895.)

#### No. 450.

1. CORPORATIONS—VALIDITY OF CONTRACTS WITH OFFICERS.

The S. Co. was in urgent need of funds to complete certain smelting works, which were necessary in order that it might commence business, but was without money or credit. In these circumstances, the board of directors authorized the president to negotiate a loan of $18,000, secured by a mortgage of the company's real estate. The day after such authority was given, the president informed the board that he had negotiated a loan of $18,000 at 20 per cent. commission, to be secured by mortgage of the company's property, and this proposition was accepted by the board. The mortgage was executed, and the money, amounting to $14,400, was paid to the company, and used by it, with the knowledge of the stockholders, in paying off mechanics' liens, and completing and setting in operation the smelting works. The loan was in truth made by the president and another director, but this fact was not communicated to the board of directors. *Held*, that the action of the president and director in negotiating with themselves for a loan to the company, and exacting a commission of 20 per cent. without informing the board of directors that they were the interested parties, was a breach of their duty as officers of the corporation, and the transaction might have been rescinded by the corporation, upon refunding the money received by it.

**2.** SAME—ULTRA VIRES—ESTOPPEL.

At the time when the board of directors voted to obtain the loan, and when the mortgage was given, a by-law of the corporation was in force, requiring the action of two-thirds of the stockholders to authorize the incurring of a debt in excess of funds in the treasury, and prohibiting the incurring of debts in excess of 75 per cent. of the value of unsold stock in the treasury. *Held* that, though the loan was obtained in violation of the by-law, the corporation, having received and used the money, with the knowledge of the stockholders, was estopped to deny the authority of the directors to borrow it, and was liable for the amount actually received, with interest.

**3.** SAME.

When an act done by a private corporation is not per se illegal nor malum prohibitum, but is simply ultra vires, and is not a matter of public concern, but merely affects the interests of the stockholders, the latter may so act as to deprive themselves of the right to challenge its validity.

Appeal from the Circuit Court of the United States for the District of Colorado.

George W. Lubke (Hugo Muench, on the brief), for appellants.

R. H. Gilmore, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This case comes before us on appeal from a decree of the circuit court of the United States for the district of Colorado, canceling the lien of a mortgage on certain property belonging to the St. Louis-Colorado Smelting & Mining Company, which is situated in Pitkin county, Colo. The bill of complaint on which the decree in question was obtained was filed by the appellees James M. Thomas, Miriam A. Thomas, and Flora L. Bannerman, who were stockholders of the St. Louis-Colorado Smelting & Mining Company, against the appellants, John C. Bensiek, Leonard C. Wenzel, Martin V. Medart, and Walter L. Graydon, who were acting at the time as directors of the company, and against Edward C. Boehmer, its assistant secretary. The corporation, which, for brevity, will be hereafter spoken of as the "smelting company," was at first made a defendant to the bill; but at a later date, and before the trial, it was substituted as a party complainant. The bill thus filed charged generally that the several defendants above named had entered into a conspiracy to wrong and injure the corporation and the majority of its shareholders; that they had concocted a scheme to obtain the full control and management of the company's smelting works, mines, buildings, and water power in the state of Colorado, with a view of so managing the same as to secure to themselves, as individuals, the title to all of the company's property, and to thereby cheat and defraud the corporation and a large number of its stockholders. The bill described at considerable length the various steps that had been taken by the defendants to carry out the alleged fraudulent scheme; and, among other things, it averred that they had unlawfully caused two deeds of trust, in the nature of mortgages, to be placed upon the company's property in Colorado, and that after the execution

of such mortgages the defendants, as directors, had done everything within their power to diminish the earnings of the company, and to depreciate the value of its property, for the purpose of preventing the shareholders from paying said mortgages, and with a view of acquiring all of the corporate property at a foreclosure sale thereunder. One of these mortgages was executed on the 10th day of June, 1891, by John C. Bensiek, as president of the smelting company, and by Leonard C. Wenzel, as its secretary, to secure a note of the company in the sum of $18,000, which was dated June 10, 1891, and was made payable one year after date. The other mortgage was executed by the same officers on October 22, 1891, to secure the company's note of that date for $10,000, which was made payable on June 10, 1892. On the final hearing of the case the circuit court affirmed and upheld the validity of the last-mentioned mortgage, in the sum of $10,000; but it found and decided that the first of the above-described mortgages, in the sum of $18,000, was not a valid lien on the company's property. It accordingly decreed that "the defendants * * * be * * * enjoined, barred, and estopped from advertising or selling, or attempting to sell, the said premises, or any part thereof, for the purpose of paying the said $18,000 note"; that said mortgage in the sum of $18,000 be "canceled and discharged of record, * * * but without prejudice * * * to any right of the owners and holders of said note of $18,000 to demand payment and collect the same by any lawful proceeding, as they may be advised, except by recourse to said deed of trust hereinbefore mentioned." This was the substance of the relief granted by the circuit court. As to all other matters and things alleged in the complaint, the court found adversely to the complainants, and dismissed their bill. From the decree aforesaid both parties at the time prayed an appeal, which was allowed; but as the complainants below failed to prosecute their appeal, either by filing an assignment of errors or by giving bond, this court cannot review the action of the circuit court, in so far as it was adverse to the complainants, in refusing to grant them all of the relief prayed for. The Stephen Morgan, 94 U. S. 599; Mt. Pleasant v. Beckwith, 100 U. S. 514, 527; rule 11 of this court (11 C. C. A. cii.[1]). The chief question, therefore, which we have to consider on this appeal, is whether the circuit court erred in canceling the mortgage of June 10, 1891, which was given to secure the smelting company's note for $18,000, and in refusing to allow the holders of that note a lien upon the company's property for any portion of that sum. The consideration of this question involves a statement, somewhat in detail, of the circumstances under which the mortgage in question was executed.

It appears from the testimony that the smelting company was formed in July, 1889, under the laws of the state of Illinois, for the purpose of engaging in the business of mining and smelting ores in the state of Colorado. It was organized with a large nominal capital, but with very little actual capital. The few individuals—

[1] 47 Fed. vi.

some six or seven in number—who originally acted as promoters of the corporation each subscribed and paid for 1 share of its capital stock, the shares being of the par value of $10 each. The residue of the capital stock, 299,994 shares, was issued to James M. Thomas, one of the appellees, in exchange for certain unimproved mining property in the state of Colorado, which the company, it seems, agreed to purchase from him at a valuation of $2,999,930. On the same day that the bulk of the capital stock was thus issued to Thomas, he reassigned 200,000 shares thereof to a trustee of the company, to be sold from time to time, as the board of directors might order, for the purpose of raising a working capital for the corporation. With the proceeds of the stock so held in trust, and termed "treasury stock," land was subsequently acquired by the company in Pitkin and Eagle counties, Colo., whereon to erect smelting works, and a contract was made with said James M. Thomas to erect the smelting works for the sum of $23,000. This sum was paid to him, he agreeing, for that price, to complete the works, and to deliver them to the company free of mechanics' liens. The purchase of these lands, the payment thus made to Thomas, and some other expenses of the company, appear to have practically exhausted its resources. Thomas failed to complete the works pursuant to his agreement with the company, and on or about June 1, 1891, he announced his inability to further proceed with the work unless additional funds were provided by the company. He admits that he reported to the board of directors about the 1st of June, 1891, that it would be necessary, in his judgment, to raise $20,000 to pay off existing mechanics' liens upon the unfinished smelting works, and to complete the same, and to provide the requisite means to put them in successful operation. At that time the company was destitute of money or credit. Its only resource consisted of some 68,000 shares of treasury stock that remained unsold, but it was unsalable in any market, and could not be utilized as a security for borrowing money. Such, in brief, were the conditions that existed when the mortgage of June 10, 1891, was executed. The minutes of the proceedings of the board of directors of the smelting company show that at a meeting of the board held on June 9, 1891, the following resolution was adopted:

"Moved, that the president be authorized to negotiate a loan of eighteen thousand dollars, giving deed of trust upon the company's property in Colorado as security for same; the money so obtained to be used in paying debts of the company, and to pay expenses of operating smelter."

The minutes also show that at a meeting of the board held on the succeeding day, June 10, 1891, the following action was taken:

"The president reported that he had made a loan of eighteen thousand dollars at a commission of twenty per cent., commission being deducted at once, and giving deed of trust on company's property in Colorado, as per previous resolution of the board. Moved by W. L. Graydon, and seconded by D. P. Kane, that the action of the president be approved. Carried."

There is some controversy as to whether the board of directors of the smelting company, at a lawful meeting of that body, ever authorized the execution of a deed of trust in the manner indicated

by the aforesaid resolution of June 9, 1891, and as to whether the loan was reported to the directors, and approved at a lawful meeting of that body held on June 10, 1891. One member of the board, and perhaps two, who are represented as having been present at these meetings, testified very positively that no meeting of the board was held either on June 9 or 10, 1891, and that no resolution was passed, at any meeting of the board, authorizing the execution of a deed of trust on the company's property to secure a note for $18,000, or any other sum, and that no report was ever made by the president to the board of directors that such a loan had been consummated, or that such an incumbrance was to be executed. On the other hand, three members of the board, besides the secretary who kept the minutes of these meetings, are equally positive that the meetings were duly held as represented, and that the foregoing extracts from the record book of the corporation correctly report the action taken by the directors at such meetings. We have given careful attention to all of the evidence bearing upon this issue of fact, and, without entering into a critical review of the same, it will suffice to say that, in view of all the testimony, we feel satisfied that the meetings in question were lawfully held on the days above indicated, and that the minutes of the proceedings were kept with substantial accuracy. We believe that the board did in fact authorize President Bensiek to negotiate a loan for $18,000, and to secure the same by executing a deed of trust in the nature of a mortgage on the company's Colorado property; that the president reported to the board that the loan had been secured, and the amount of the commission that had been charged for the same; and that his action in that behalf was approved in the manner above shown. It must be presumed that the record book of the corporation, which purports to show the action taken by its board of directors, was properly kept, and that it speaks the truth. The burden of proof rests upon those who seek to impeach the record, and in this instance we are constrained to hold that the evidence offered by the appellees was insufficient to overcome the foregoing presumptions. We find, however, and that fact does not seem to be denied, that no report was made to the board as to the source from which the money had been derived. The president of the company, Mr. Bensiek, says, in substance, that as the company was badly in need of funds, and compelled to borrow them at any cost, he did not suppose it to be at all material where the money was obtained, and that he did not report the fact to the company that it had been advanced by himself and Wenzel. It is highly probable, we think, that the directors supposed that the president of the company had pledged his personal credit to obtain the loan, as they well knew that the company was destitute of credit to borrow so large a sum as $18,000. At the same time, it is doubtless true that the directors were ignorant of the fact until some time either in the month of November or December, 1891, that two of their own number, John C. Bensiek and Adam Wenzel, had advanced the greater part of the money to purchase the company's note and deed of trust. The validity of the incumbrance of June 10,

1891, which was executed under the circumstances aforesaid, and was purchased by two of the directors, Bensiek and Wenzel, is challenged by the appellees on two principal grounds. In the first place, it is said that the authority conferred by the resolution of June 9, 1891, to negotiate a loan in behalf of the company did not authorize the president of the company to negotiate with himself to advance the money, or to negotiate in that behalf with himself and his codirector, Wenzel. For this reason it is urged that the deed of trust is void. In the second place, it is contended that by reason of a by-law of the corporation the directors had no power to authorize the execution of the deed of trust. The by-law referred to is as follows:

"No debt or liability shall be contracted or incurred for the company, except by order of the board of directors. But, whenever it shall be deemed advisable to contract debts in excess of the funds actually in the treasury, the same shall first be authorized by a vote of two-thirds of all the stock, at any general stockholders' meeting, or special meeting called for the purpose: provided, that in no case shall such debts exceed seventy-five per cent. of the value of the stock remaining unsold in the treasury, and such stock shall stand pledged for such debt."

It will be more convenient to consider the last of these objections first. Referring, then, to the by-law, it will be observed that it does not restrict the power of the directors in the matter of giving security for borrowed money, whether such security consists of a mortgage or other security. It merely prohibits the directors from contracting an indebtedness to an amount exceeding 75 per cent. of the value of the stock remaining unsold in the treasury. The smelting company is an Illinois corporation, and under the laws of that state the power to mortgage property as security for an indebtedness, when not expressly denied to a corporation, is regarded as existing as an incident to its power to acquire and hold real estate; and such power, under the laws of that state, may be exercised by the directors or other governing body, unless it is expressly withheld by the charter or by-laws. Horticultural Society v. Paddock, 80 Ill. 263. The only effect of the by-law, therefore, is to restrict the power of the directors in the matter of contracting an indebtedness. To the extent that the directors could contract a debt, and bind the corporation to pay the same, they could undoubtedly pledge the corporate property, by a deed of trust or otherwise, as a security for its payment. The point to be considered, therefore, is whether the money advanced by Bensiek and Wenzel was advanced under such circumstances that the company is bound to repay it. If it was so advanced, then, notwithstanding the objection based on the by-law, the deed of trust is a valid security for whatever sum is recoverable from the corporation.

We think it clear that, upon the state of facts disclosed by the record, the amount of money actually advanced by Bensiek and Wenzel on the security of the smelting company's note and deed of trust is recoverable from the company; and this without reference to the question whether the sum of $18,000 authorized to be borrowed by the directors was or was not in excess of 75 per cent. of the value of unsold stock in the company's treasury. The com-

pany actually received from Bensiek and Wenzel the sum of $14,400, and expended the same in paying its outstanding indebtedness which existed when the loan was authorized, and in completing its smelting plant which Thomas, one of the appellees, had left in an unfinished condition, and was unable to complete. The evidence contained in the record leaves no room for doubt, and the fact is not seriously denied by the appellees, that during the months of June and July, 1891, there was paid into the hands of the assistant treasurer of the company, by Bensiek and Wenzel, the sum of $14,400, and that this sum was used by the company to liquidate its debts, to complete its smelting plant, and to put the same in operation. Of this amount, the sum of $10,000 appears to have been used in discharging attachment and mechanics' liens against the company's property. Furthermore, all of the shareholders of the company who took an active interest in its affairs appear to have known that these lien claims were being paid with money that had been borrowed from some one by authority of the board of directors. Under these circumstances, it is clear, we think, that the smelting company is not in a position to plead "want of authority" on the part of its board of directors to borrow the money in question, as a defense to a suit by the lenders to recover it. When an act done by a private corporation is not per se illegal, or malum prohibitum, but is simply ultra vires, and is not a matter of public concern, but merely affects the interests of the stockholders, the latter may so act as to deprive themselves of the right to challenge its validity. Thus, in the case of Kent v. Mining Co., 78 N. Y. 159, a corporation had issued preferred stock to certain of its shareholders in lieu of common stock theretofore held. Although the issuance of such preferred stock was unauthorized, being in violation of a by-law of the company, yet it was held that holders of common stock who were acquainted with the issue of such preferred stock, and had suffered it to be issued and sold on the market without taking any steps to arrest the proceeding, were estopped from maintaining an action against the corporation to have the same canceled. In the case of the Sheldon Hat-Blocking Co. v. Eickemeyer Hat-Blocking Machine Co., 90 N. Y. 607, the trustees of a manufacturing company had assigned and transferred all of the property of the company in settlement of a judgment against it. All of the stockholders had knowledge of the assignment of the corporate property at or about the time it was made. It was held that although the trustees had acted without authority in making the assignment, yet as the shareholders had taken no action to arrest the transfer, and as the act was simply ultra vires, they were estopped from maintaining a suit to set the assignment aside. In the case of Plank-Road Co. v. Murray, 15 Ill. 336, the facts were that the directors of the company had borrowed money without authority, and had given a mortgage upon the company's property to secure it. It was held that, inasmuch as the company had received the money, and used it, it was estopped from questioning the authority of the officers who had made the loan. Also, in Troup's Case, 29 Beav. 353, 357, it was decided by the master of

the rolls that, when the directors of a company have no power to borrow money, a person lending money, to the company cannot enforce payment of it against the company, unless it has been bona fide applied to the purposes of the company, but that, if so applied, a recovery against the company may be had. We conclude, therefore, that because the smelting company received the money that was advanced by Bensiek and Wenzel under the authority conferred by the directors to negotiate a loan, and appropriated the same to the payment of its debts and to the completion of its smelting works, the money so advanced is recoverable from the company, and that the by-law above quoted does not preclude such a recovery, or impair the validity of the deed of trust as a security for the sum of money actually advanced. A corporation should not be permitted to allege want of authority on the part of its directors to borrow money, when it has received a sum of money actually borrowed, and has used it to pay its debts, with full knowledge of the fact on the part of all of its directors, and many of its shareholders. A corporation, as well as an individual, is at least bound to act honestly; and it should not be allowed to say that an act done by its officers was unauthorized, when it has accepted the benefits accruing therefrom, and does not offer to restore what it has received.

It remains for us to determine whether the objection to the deed of trust first above mentioned is well founded; that is to say, whether Bensiek's failure to report to the directors that he and Wenzel were the persons who proposed to take the loan for $18,000 renders the deed of trust voidable and unenforceable in their hands. This objection is entitled to more weight than the one last considered. It is elementary law that an agent authorized to act for a principal in a given negotiation cannot deal with himself. He cannot, when authorized to buy property or borrow money, sell his own property, or loan his own funds, without communicating the fact to his principal. An agent cannot unite his personal and representative characters in the same transaction. This doctrine applies to all persons who occupy a fiduciary relation, and it is especially applicable to the officers of a corporation, when acting for and in behalf of the company. They cannot use their official position to benefit themselves individually. In short, an officer of a corporation is not qualified to act for his company in any transaction wherein the corporation is dealing with the officer. There are many cases, as might be expected, in which this wholesome doctrine has been enforced, from among which the following authorities may be selected as an example: Mallory v. Wheeler Co., 61 Conn. 131, 23 Atl. 708; Davis v. Mining Co., 55 Cal. 359; Railway Co. v. Poor, 59 Me. 277; Ogden v. Murray, 39 N. Y. 202; Smith v. Association, 78 Cal. 289, 20 Pac. 677; Koehler v. Iron Co., 2 Black, 715, 721; Claflin v. Bank, 25 N. Y. 293. It must be conceded, therefore, that when the smelting company discovered that two of its own officers had taken the loan of $18,000, secured by a deed of trust on its property, and had received a commission of 20 per cent. on the amount of the loan, it had the right to treat that

transaction as voidable, and to rescind the agreement to borrow the money on such terms,, if it thought proper to do so. It is undoubtedly true, we think, that, when the money in question was advanced by Bensiek and Wenzel, it could not have been obtained from any other source on the security that the company had to offer, and that, if these directors had not come to the rescue of the company, it would have failed to procure the necessary funds either to pay its existing debts or to complete its smelting works. The evidence does not warrant the inference that either of these directors intended to defraud the company in the transaction, or to gain any advantage over the remaining shareholders. It is most probable, we think, that their motive in advancing the money to the company, in which they had at the time a large interest, was to help it out of its financial difficulties, and that the large commission charged for the loan was due to the precarious character of the security on which the loan was made. But these concessions cannot be accepted as a sufficient excuse for the failure of these directors to report to the board that they had themselves decided to advance the money to the company for a commission of 20 per cent., and that the deed of trust was to be executed for their benefit. The board was entitled to this information before it acted upon the proposed loan. Besides, it was the duty of both of the directors who proposed to furnish the money to disclose the source from which it was derived, before the board was asked to accept the proposal. We conclude, therefore, that, when the company discovered that the money had been advanced by two of the directors, it was entitled to repudiate the agreement to pay, a commission of 20 per cent. for the loan, and that it was also entitled to have the deed of trust canceled and discharged, on refunding to the lenders the amount of money that it had actually received, and that had been expended for the company's benefit. Notwithstanding the fact that the transaction between these directors and the company was voidable on the ground heretofore stated, it would be highly unjust and inequitable to annul the deed of trust without requiring the smelting company, as a condition precedent to such relief, to restore what it has received on the strength of that security. A suitor who seeks equity in a court of chancery must do equity. This is a rule of universal application which may well be applied in the present case to accomplish the ends of justice. Sturgis v. Champneys, 5 Mylne & C. 97, 101; Comstock v. Johnson, 46 N. Y. 615; Pom. Eq. Jur. (2d Ed.) §§ 385, 386. A court of equity cannot overlook the fact that some nine or ten thousand dollars of the money advanced on the security of the deed of trust was expended by the company in paying claims that were liens on its property, and that the balance was consumed in completing its smelting works, and thereby enhancing the value of its property. To the extent that the money advanced by Bensiek and Wenzel was used in discharging existing liens upon the company's property, they would undoubtedly have been entitled to a decree subrogating them to the rights of the lien claimants whose debts they had paid, if they had filed a cross bill demanding such

relief.    But, be this as it may, we are persuaded that the circumstances under which the money in question was advanced did not warrant an unconditional decree canceling the deed of trust of June 10, 1891, and relegating the appellant Bensiek to the position of an unsecured creditor.    That portion of the decree, therefore, which canceled and discharged said deed of trust, and perpetually enjoined the appellants from causing a sale to be made thereunder, does not meet with our approval, and must be reversed. In lieu of that provision of the decree, the circuit court should enter a modified order, adjudging that said deed of trust be canceled and discharged of record, and that the defendants be enjoined from enforcing the same, by a sale or otherwise, provided, the complainants below shall, within 60 days from the entry of the modified decree, pay into the registry of the circuit court, for the benefit of the defendants, John C. Bensiek and Adam Wenzel, the owners of said deed of trust, the sum of $14,400, together with interest thereon at the rate of 6 per cent. per annum, from August 1, 1891, until such payment shall be made, and that, in case said complainants fail to pay into court said sum of money and interest within the time limited aforesaid, the defendant John C. Bensiek and Adam Wenzel, the owners of said deed of trust, be thereafter at liberty to proceed with the enforcement of said deed of trust for the amount of money actually advanced thereon, and no more, to wit, for the sum of $14,400, and interest at the rate of 6 per cent. per annum from August 1, 1891, in such mode and manner as they may see fit to pursue.    We are furthermore of the opinion that so much of the decree of the circuit court as assessed all of the costs of the litigation against the appellants should also be reversed, and that the costs in the circuit court should be divided, each party to the suit paying the costs by it occasioned and incurred.    The decree of the circuit court is accordingly reversed in the respects above indicated, and the cause is remanded to the circuit court for further proceedings therein in accordance with the directions heretofore given.