**MHC INVESTMENT COMPANY,**
**Plaintiff,**

v.

**RACOM CORPORATION Defendant,**

v.

**Ronald W. Stepien, Dennis H. Melstad, and David Sokol Third-party Defendants.**

**No. 4–01–CV–90708.**

United States District Court,
S.D. Iowa,
Central Division.

June 19, 2002.

Mark McCormick, Des Moines, IA, for plaintiff and third-party defendant.

Kevin H. Collins, Nancy J. Pinner, Cedar Rapids, IA, for defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, MHC Investment Company ("MHC"), filed this action for judgment on a series of agreements between itself and Defendant Racom Corporation ("Racom"). Racom has pled affirmative defenses of fraudulent inducement, lack of authority on the part of Racom's board of directors to enter the agreement, and lack of consideration. Racom has also brought counterclaims against MHC and the individual third-party defendants for fraud, civil RICO, slander per se, and breach of fiduciary duty. Plaintiff MHC now moves for summary judgment on its original claim and, along with the third-party defendants, moves for summary judgment on Racom's counterclaims. Racom has resisted and also moved to extend summary judgment proceedings pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. On April 2, 2002, the Court denied Racom's motion to extend. For the following reasons, MHC's motions for summary judgment are now granted.

## I. Facts

Racom is in the business of providing two-way radio service to utilities, emergency services and law enforcement. MHC is a holding company with interests primarily in energy utilities. On July 16, 1996, MHC's predecessor-in-interest, MidAmerican Capital Company, purchased the sole share of Series A Preferred Stock of Racom pursuant to a Stock Purchase Agreement. The Series A Preferred Stock (the "Preferred Share") had a cumulative dividend rate of 8% per annum with dividends payable semi-annually on June 30 and December 31 of each year. Dividends were deferred for the first two years after the Stock Purchase Agreement and issuance of the Preferred Share.

The parties also agreed that pursuant to the Stock Purchase Agreement, at least six directors of Racom must authorize any "Important Matter," as defined in the Agreement. Racom President Gregg Miller acknowledges in his testimony that this provision was requested by MHC in negotiations. Racom's board minutes indicate at least six board members attended every board meeting in 1999. The parties also agreed that MHC would have the right to elect two representatives to Racom's board of directors.

Finally, the Stock Purchase Agreement grants MHC a "Put" on its Preferred Share, by which MHC may tender the Preferred Share back to Racom for its original price of $10 million (the "Redemp-

tion Price"), in addition to any accrued or unpaid dividends, in the event that Racom did not meet certain specified financial conditions by July 16, 2001. Under this provision, MHC would have until September 16, 2001 to tender the put and then Racom would be required to meet the obligation with cash within 90 days of receiving notice that MHC was exercising the right.

On June 29, 1998, the parties also agreed that MHC would loan Racom $9.75 million dollars with an interest rate of 14% to resolve a dispute with another shareholder, Ericcson, and buy out Ericcson's stake in Racom. All of Ericcson's shares were purchased in an effort to resolve a conflict over Ericcson's alleged nonperformance of equipment delivery and faulty equipment performance. In January 1999, MHC accepted 45 shares of common stock in Racom in exchange for its forbearance of certain rights under the Stock Purchase Agreement relating to the payment of dividends that were due but not paid in December 1998. Due to another anticipated nonpayment on June 30, 1999, the parties signed a Common Stock Agreement on June 15, 1999, resulting in an increase in the dividend rate and interest rate on unpaid dividends from 8% to 8.5% retroactively effective on January 1, 1999. In addition, the Common Stock Agreement requires Racom to issue an additional 280 common shares to MHC should MHC exercise its Put.

On September 1, 1999, the parties entered into a Restructuring Agreement, resulting in Racom's issuance of an additional 85 shares to MHC and an increase in the dividend rate and interest rate on unpaid dividends from 8.5% to 9% effective

July 1, 1999. In addition, the interest rate on the $9.75 million loan was increased to 18%. In exchange, MHC extended the due date for the $9.75 million loan to June 30, 2000.[1] Racom contends none of the agreements reached subsequent to the Stock Purchase Agreement were approved by the necessary quorum of six Racom directors; however, Racom's board minutes indicate otherwise.

As of July 16, 2001, Racom had not met the financial conditions specified in the Stock Purchase Agreement, thus MHC was eligible under that Agreement to exercise its Put. MHC began formulating an exit strategy for its investment in Racom and Mr. Melstad led a team to study possible options. At the time, Mr. Melstad was President of MHC and one of MHC's two representatives on the Racom board of directors.

MHC tendered the Put on September 12, 2001. MHC estimated that Racom was obligated to pay $15,155,366.60 based on accrued and unpaid dividends added to the Redemption Price. Racom has never challenged this accounting. Racom stated in a press release that it had "made a tender offer of $15 million," and that it was "ready, willing, and able to honor its agreement;" however, Racom also claimed that "MHC has made demands which are not provided for in the agreement and has refused the offer."

In addition to the action before this Court, several other actions ensued. MHC's representatives on Racom's board, Mr. Melstad and Mr. Stepien, sued Racom in the Delaware Court of Chancery to challenge their removal from Racom's board subsequent to the exercise of the

---

1. If the note was not repaid in full by December 31, 1999, then Racom would have to issue stock to MHC according to a monthly schedule given in the Restructuring Agreement, beginning in December 1999 and continuing until June 2000 or the repayment of the loan, whichever would occur earlier. The loan was repaid by December 1999 and is not subject to MHC's breach of contract claim.

Put. MHC also filed an action in that same court seeking to inspect Racom's books and records. In addition, Racom brought an action in Iowa District Court for Marshall County seeking a determination of the validity of certain actions of Racom's board as well as a determination of the validity and enforceability of the Stock Purchase Agreement. MHC removed that action and a motion to remand is pending in that case. Extensive discovery has already taken place in the Delaware actions.

## II. Summary Judgment Standard

The purpose of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). Summary judgment "allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to [conserve] scarce judicial resources." *Id.*

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *cited in Handeen v. Lemaire*, 112 F.3d 1339, 1345 (8th Cir.1997); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. Fed.R.Civ.P. 56(c), (e); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. MHC's Breach of Contract Claim

Racom contests MHC's breach of contract claim with the affirmative defenses of fraudulent inducement, lack of authority on the part of Racom's board of directors to enter into the contract, and lack of consideration. The Court will address these defenses in turn.

## A. Fraudulent Inducement

■ Under Iowa law, a contract procured by another's fraud is voidable. *C.E.*

*Hosier v. Hosier ex rel. Estate of C.W. Hosier,* 2001 WL 1451137 (Iowa App.) at *6 (citing Restatement (Second) of Contracts §§ 7, 380) *see also Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 829 (N.D.Iowa 1997); *Phipps v. Winneshiek County,* 593 N.W.2d 143, 145 (Iowa 1999). Accordingly, fraudulent inducement is a defense to a breach of contract claim. *Gunderson v. ADM Investor Services, Inc.,* 85 F.Supp.2d 892, 919 (N.D.Iowa 2000); *Higgins v. Blue Cross of Western Iowa and South Dakota,* 319 N.W.2d 232, 236 (Iowa 1982). The elements for establishing the defense fraudulent inducement are the same as those for establishing a fraud claim. *See Tralon Corporation v. Cedarapids, Inc.,* 966 F.Supp. 812, 827 (N.D.Iowa 1997). "In a common law action for fraud, the following elements must be proven: (1) a material misrepresentation (2) made knowingly (scienter), (3) with intent to induce [the other party] to act or refrain from acting, (4) upon which the plaintiff justifiably relies, (5) with damages." *Rosen v. Board of Medical Examiners of the State of Iowa,* 539 N.W.2d 345, 349 (Iowa 1995) (citing *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 340 (Iowa 1991)); *see also Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215 (8th Cir.1987).

 Both Racom's fraud claim and its defense of fraudulent inducement are unique in that they do not include any specific allegation of any representation that was false in any way, which is the first element of fraud. Racom recounts a long complicated history of transactions between these companies, replete with secret takeover plans and transactions under duress; however, at no point has Racom ever identified a false representation by MHC. Thus, regardless of whether the Court views the history of this transaction as perfectly legitimate or a sordid tale, the Court may not forego enforcement of this contract on the basis of fraudulent induce-

ment without any allegation of a false representation.

 Even if Racom had properly demonstrated the existence of fraudulent inducement into this contract, the Court would still enforce it. Where a party asserts fraudulent inducement to a contract, it must disaffirm the contract promptly and restore or offer to restore what the other party received under it. *Kunkle Water & Electric, Inc. v. City of Prescott,* 347 N.W.2d 648, 654 (Iowa 1984). *See also Hosier* at *6 (citing *Staly v. McNerney,* 233 Iowa 1065, 10 N.W.2d 584, 589 (Iowa 1943)). Racom received $10 million nearly six years ago under this alleged fraudulent contract but has not returned that money or reasonable interest that would have accrued from holding it over the course of six years.

## B. Lack of Authority

Racom also contends that the Court should not enforce their agreements with Racom subsequent to their initial 1996 agreement because Racom's Board of Directors lacked authority to enter into those agreements and MHC's representatives on the Board violated their fiduciary duty in approving them. The agreements in question here are the First Amendment to the Stock Purchase Agreement executed between the parties as of June 15, 1999, a Common Stock Agreement as of the same date, and a Restructuring Agreement dated as of September 1, 1999 (collectively, the "1999 Agreements"). These agreements increased the dividend rate from 8% to 8.5% and finally to 9% and provided for additional issuances of common shares to MHC, in exchange for MHC's forebearance on dividend and loan payments that were due in 1998 and 1999. The agreements also provided for an additional 280 shares to MHC should it exercise its Put in 2001. Finally, these agreements provid-

ed for an increase of the interest rate from 14% to 18% on the $9.75 million loan from MHC to Racom.

## 1. Quorum of Directors

 Racom contends that the 1999 Agreements were approved by a Racom board that only consisted of five directors, one short of the minimum required by the Stock Purchase Agreement between Racom and MHC. It is clear that the provision requiring approval from six directors is not a condition inserted to protect RACOM from itself but to protect MHC, its outside investor. "A party may waive a condition precedent to his *own* performance of a contractual duty when such condition precedent exists for his sole benefit and protection, and compel performance by the other party who has no interest in the performance or nonperformance of the condition." *Rodgers v. Baughman*, 342 N.W.2d 801, 806 (Iowa 1983). Thus, the approval of the requisite number of directors is immaterial to Racom's performance in this case.

Moreover, where a corporation has retained the benefits of an agreement, as Racom has, it cannot then avoid performance by claiming the agreement was unauthorized and therefore invalid. "To say that a corporation cannot sue or be sued upon an ultra vires arrangement is one thing. To say that it may retain the proceeds thereof which have come into its possession without making any compensation whatever to the person from whom it has obtained them, is something very different ..." *Aldrich v. Chemical Nat. Bank of New York*, 176 U.S. 618, 635, 20 S.Ct. 498, 44 L.Ed. 611 (1900) (quoting Green's Brice's Ultra Vires, 618); *see also Des Moines Blue Ribbon Distributors, Inc. v. Drewry's Ltd., U.S.A., Inc.*, 256 Iowa 899, 129 N.W.2d 731 (1964); *Rubenstein v. Nourse*, 70 F.2d 482, 485 (8th Cir.1934); *Bensiek v. Thomas*, 66 F. 104, 111 (C.C.A.8 1895) ("A corporation, as well as an individual, is at least bound to act honestly; and it should not be allowed to say that an act done by its officers was unauthorized, when it has accepted the benefits accruing therefrom, and does not offer to restore what it has received.")

In any event, this discussion is academic, since according to the Racom board minutes in evidence in this case there were six directors in attendance at board meetings throughout 1999 and Racom has not alleged any dissenting votes.

## 2. Breach of Fiduciary Duty

 Racom also asserts the 1999 Agreements are invalid because of an alleged breach of fiduciary duty on the part of the MHC representatives on the Racom board in approving them. While Racom's primary place of business is in Iowa, it is incorporated in Delaware. In a previous case, this Court noted that Iowa case law does not appear to address the issue of what law applies to a breach of fiduciary duty claim. *Grove v. Principal Mut. Life Ins. Co.*, 14 F.Supp.2d 1101, 1106–7 (S.D.Iowa 1998). In *Grove*, this Court applied the "most significant relationship" test as recommended by § 188(2) of the Restatement (Second) of Conflicts of Law (1971); however, the claims in *Grove* were based on insurance fraud and were not claims against directors or officers of a corporation or raised as a challenge to the validity of a transaction. For the types of breach of fiduciary duty claims raised in this case, the Court finds it must follow the "internal affairs doctrine," which is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."

*Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). The Restatement (Second) of Conflicts of Law advises that "[s]tates normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care." *Id.* (citing Restatement (Second) Conflict of Laws § 309 (1971)). Parties often freely choose the state of incorporation and that state's laws already necessarily govern at least some of the internal affairs of the corporation, as they do in two lawsuits in this case. Consequently, the Court finds that, in light of the internal affairs doctrine, the laws of the state of incorporation should apply in breach of fiduciary duty cases against directors and officers.

It is certainly true that MHC's representatives on Racom's board owed Racom an "uncompromising duty of loyalty." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983). In *Weinberger,* the Delaware Supreme Court quotes its early and eloquent recitation on a director's duty of loyalty:

> A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation ... The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.

*Id.* (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939)). Consequently, the common law rule with respect to transactions involving interested directors was that their vote was not counted and Courts could therefore hold the transactions voidable. *Kerbs v. California Eastern Airways Inc.*, 90 A.2d 652, 658 (Del.1952) (citing *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del.1944)).

In 1967, Delaware altered this rule significantly with the enactment of Section 144 of the Delaware General Corporation Law.

> (a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:
>
> (1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or
>
> (2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or
>
> (3) The contract or transaction is fair as to the corporation as of the time it

is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

DEL. CODE ANN tit 8. § 144 (2001). In the case at bar, Racom has offered no evidence whatsoever that any of its directors opposed the 1999 Agreements or that any board members were not aware of the MHC representatives' ties to MHC. In fact, the negotiations were conducted at arm's length by Gregg Miller, Racom's controlling shareholder, while MHC's board representatives did not participate. Thus, by statute, the 1999 Agreements were not voidable.

Racom cites *Weinberger* for the proposition that "[w]hen directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." This raises the question of whether the Court is required to review the 1999 Agreements under the exacting "entire fairness" standard regardless of whether the 1999 Agreements fall within the safe harbor of section 144(a). If not, this Court would apply the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). Under the business judgment rule, the burden is on the "party challenging the [board's] decision to establish facts rebutting the presumption." *Id.* If this presumption is not rebutted, a "court will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'" *Unocal,* 493 A.2d 946, 954 (Del.1985).

Indeed, in certain types of transactions, "compliance with the terms of Section 144 does not restore to the board the presumption of the business judgment rule; it simply shifts the burden to the plaintiff to prove unfairness." *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1154 (Del. Ch.1994) (citing *Kahn v. Lynch Communication Systems,* 638 A.2d 1110 (Del.1994)). In *Cinerama,* the Court of Chancery stated that "one or more directors less than a majority of those voting" would rebut the application of the business judgment rule if the plaintiff proved that "the interested director controls or dominates the board as a whole or [that] the interested director fail[ed] to disclose his interest in the transaction to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction." *Cinerama* at 1153. In this case, the MHC representatives did not constitute a majority of the Racom board, did not control or dominate the board, and did not withhold their interest in the 1999 Agreements with MHC.

Moreover, the Delaware Court of Chancery has stated that the Delaware Supreme Court's holding in *Kahn* was limited to cases where the controlling shareholder was present in the transaction. *In re Western Nat. Corp. Shareholders Lit.,* 2000 WL 710192 at *26. "The Supreme Court declined to bring such a transaction fully within the purview of the director-protective business judgment rule because the presence of a controlling shareholder 'has the potential to influence', however subtly, the vote of [ratifying] minority stockholders in a manner that is not likely to occur in a transaction with a non-controlling party." *Id.* The Court of Chancery went on to hold that "because the

absence of a controlling shareholder removes the prospect of retaliation, the business judgment rule should apply..." *Id.* Racom's 1999 Agreements were not with its controlling shareholder. While *Western* involved a special committee, given the support and participation of non-MHC directors in this case, its holding still applies.

Since this case clearly merits the application of the business judgment rule, Racom must rebut the presumption that the 1999 Agreements were based on the directors' informed decision, made "in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson* at 812. There is no reason to believe and Racom does not allege that any of the non-MHC directors who approved this transaction acted otherwise. There was a clear rational business purpose in entering into the 1999 Agreements, the ability to forego dividend and loan payments that Racom could not make. Consequently, the Court cannot invalidate these transactions under the business judgment rule.

Even if the Court was required to apply the standard of entire fairness, as required under *Kahn* and *Cinerama*, the burden would still remain on Racom to show the unfairness of the transaction since it fell within the safe harbor of 144(a). *See Cooke v. Oolie*, 1997 WL 367034 at *10 (Del.Ch.). Racom has not shown why MHC's forbearance on the dividend payments that Racom failed to pay was not sufficient consideration for the additional stock and higher dividend rates it was granted under the 1999 Agreements. With respect to MHC's loan to Racom, the 14–18% interest rates appear reasonable given Racom's credit history up to that point. Thus, Racom's assertion of a breach of fiduciary duty would fail even under the more stringent "entire fairness" standard.

## C. Lack of Consideration

In its 1999 agreements with MHC, Racom granted MHC higher dividend rates, higher interest rates, and more shares of common stock in exchange for MHC's foregoing scheduled dividend payments. Racom argues that MHC "forced" them into those agreements. If Racom presented any evidence or specific allegations in support of this assertion, which it did not, Racom could raise the affirmative defense of coercion. *Eaton v. Marion County Fair Ass'n*, 172 F.Supp.2d 1184, 1187 (S.D.Iowa 2001) (citing *Fees v. Mut. Fire and Auto. Ins. Co.*, 490 N.W.2d 55, 58 (Iowa 1992)).

Racom seemingly confuses the defense of coercion with the defense of lack of consideration. The Iowa Supreme Court adopts the definition of "consideration" used in the Iowa Civil Jury instructions: " 'Consideration' is either a benefit given or to be given to the person who makes the promise [or some other person] or a detriment experienced or to be experienced by the person to whom the promise is made [or some other person]. Where the contract provides for mutual promises, each promise is a consideration for the other promise." *Federal Land Bank of Omaha v. Woods*, 480 N.W.2d 61, 65 (Iowa 1992) (citing Iowa Civil Jury Instructions 2400.4 (1986)). Thus, whether Racom willingly entered into the 1999 agreements or was forced to sign them at gunpoint, Racom received a benefit of relief from its dividend obligations in exchange for the benefits it granted MHC in the 1999 Agreements. Consequently, the 1999 Agreements do not fail for lack of consideration.

## IV. Racom's Counterclaims

Racom counterclaimed in this action for fraud, RICO, breach of fiduciary duty, and slander per se. The Court addressed Racom's fraud allegations in its discussion of

Racom's fraudulent inducement contract defense above. It fails as a counterclaim for the same reasons it fails as an affirmative defense. In its resistance to summary judgment on its counterclaims, Racom omitted any legal argument regarding its RICO claim, therefore the Court deems MHC's motion for summary judgment on that claim unresisted. This leaves Racom's breach of fiduciary duty claim, which it also asserted as a defense to MHC's contract claim, as well as Racom's slander per se claim.

## A. Breach of Fiduciary Duty

Racom bases its breach of fiduciary duty counterclaim on two incidents, the 1999 Agreements and MHC board representative Dennis Melstad's participation on a MHC committee seeking an exit strategy from their Racom investment.

### 1. The 1999 Agreements

The validity of the 1999 Agreements was discussed above, but the Court did not address whether the 1999 Agreements created liability on the part of the MHC representatives for breach of fiduciary duty. Section 144(a) "does not deal with the question when will a financial interest of one or more directors cast on the board the burdens and risks of the entire fairness form of judicial review. Rather it deals with the related problem of the conditions under which a corporate contract can be rendered 'un-voidable' solely by reason of a director interest." *Cinerama* at 1154. Thus, whether or not the 1999 Agreements fall within the safe harbor of Section 144(a) does not directly control Racom's breach of fiduciary duty claim directly against the MHC directors. Nev-

ertheless, "these two problemswhen will director interest replace the business judgment form of review with the entire fairness form of review and when are interested contracts not necessarily voidable are related in that both focus upon the effect of action by an 'independent' corporate decision-maker." *Id.* In *Cinerama* the Court of Chancery determined the facts fell within the holding of *Kahn* and thus necessitated the application of the "entire fairness" standard regardless of whether the transaction fell within the safe harbor of 144(a); however, in this case the application of the business judgment rule is appropriate. Such application took place *infra*, in Section III. B. 2, and the Court need not repeat it.

Since the Court has held that the 1999 Agreements pass muster under either the business judgment or the entire fairness test, the Court cannot find the MHC representatives on the board liable for a breach of fiduciary duty for their approval of them.[2] Even if such a contradiction was possible, the MHC representatives did not take any inappropriate actions. Racom does not allege the MHC board representatives withheld from the Racom board any relevant information about their relationship to MHC or their knowledge of the transaction. Nor does Racom allege that the MHC board representatives participated in any way in the negotiations, thus undermining the arms-length nature of the agreements.

### 2. The Exit Strategy

 Racom characterizes Mr. Melstad's participation on a committee seeking an exit strategy for MHC out of Racom as a secret, nefarious plan that involved Mr.

---

**2.** The Court did not address the validity of MHC's $9.75 million loan to Racom because the enforcement of that agreement is not before the Court. With respect to the breach of fiduciary duty claims against Mr. Stepien and Mr. Melstad, Racom has not sufficiently pre-

sented facts to rebut the presumption that the purchase of Ericcson's stock was based on the rational business purpose of maintaining a positive, working relationship with an important technology supplier and avoiding harmful and costly litigation.

Melstad, a Racom director, working against the interests of Racom. This characterization is inconsistent with both the law and the facts.

A review of the memo generated by Mr. Melstad's exit strategy committee makes it clear that MHC's only objective was minimizing the loss of their substantial investment in Racom. To the extent MHC discussed a takeover of Racom, it was only discussed as one option in service of their interest in minimizing their loss. Moreover, it is clear from the memorandum that MHC's objective of preserving its investment was entirely aligned with the best interests of Racom because MHC could only protect its investment by maximizing Racom's value, whether or not that involved taking control of Racom.

■ Even if MHC considered options that were not aligned with the best interests of Racom, the law recognizes the right of a preferred shareholder or creditor to protect its interests. *Odyssey Partners v. Fleming Companies,* 735 A.2d 386 (Del. Ch.1999).

> [F]iduciary obligation does not require self-sacrifice. More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance. Thus one who may be both a creditor and a fiduciary (e.g., a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.

*Id* (quoting *Odyssey Partners, L.P. v. Fleming Co.,* 1996 WL 422377 at *3 (Del. Ch.)). Mr. Melstad never took any actions as a director of Racom pursuant to MHC's exit strategy memorandum, he merely advised MHC, his employer on its own interests.

## B. Slander Per Se

Racom's slander per se claim rests on two separate incidents. In one incident, Mr. Melstad contacted Racom's banker in November 2001 to ascertain whether the bank's 1996 guaranty of a Racom loan agreement was still in effect. MHC argues that there was nothing defamatory about it posing this question and Racom did not address this incident in its resistance. Thus, the Court concludes that Racom does not resist summary judgment with respect to this particular incident.

The other incident that Racom identifies as slander per se is calls about the lawsuit made by Russ White, an officer of MHC's corporate parent, MidAmerican Energy Company, to various Racom customers. Racom alleges that Mr. White falsely stated during these calls that he was the vice-president in charge of security, as opposed to vice-president of general services, and that Racom was asked to make sure that the lawsuit would have no effect on service.

■ Under Iowa law, a defendant is liable for slander per se of a business if he (1) makes a statement, (2) which is communicated to someone other than the plaintiff, and (3) the statement would injure the plaintiff in the maintenance of its business. *Vinson v. Linn–Mar Community School District,* 360 N.W.2d 108 (Iowa 1984). *See also Hill v. Hamilton County Public Hosp.,* 71 F.Supp.2d 936, 953 (N.D.Iowa 1999); *Jenkins v. Wal–Mart Stores, Inc.,* 910 F.Supp. 1399, 1426 (N.D.Iowa 1995). Of course, "if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." *Hovey v. Iowa State Daily Pub. Bd., Inc.,* 372 N.W.2d 253, 256 (Iowa 1985).

■ It is clear that an agent of MHC made a statement to someone other than

the plaintiff; however, there is nothing about this statement that would injure Racom in the maintenance of its business. The fact that Mr. White might be in charge of security at Mid–American Energy or that MHC requested that Racom not allow the lawsuit to affect service has no bearing on Racom's ability to conduct business, which involves dealing with law enforcement and emergency services. Since this element of slander per se was not established, MHC need not prove the truth of these statements as an affirmative defense. Thus, it is unnecessary to determine whether or not Mr. White is vicepresident in charge of security or general services as Racom alleges, or whether or not MHC asked Racom to make sure the lawsuit did not affect service.

## V. Order

MHC's motions for summary judgment on its breach of contract claim and Racom's counterclaims are both granted. Racom's affirmative defenses and counterclaims are among the most frivolous the undersigned has ever seen in a case of this sort. What particularly disturbs the Court is that the money paid to the attorneys who filed these frivolous claims is money that Racom owes MHC and will possibly never pay. Instead that same money was used to force MHC to respond to these frivolous claims and endure unnecessary delay in recovering what it is owed. Consequently, this Court shall hold a hearing on July 18, 2002, at 4:00 p.m. at the United States Courthouse in Des Moines, Iowa. At the hearing, Racom's attorneys shall show cause why their pleadings did not violate Rule 11 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.